FIEGE *v.* BOEHM

[No. 188, October Term, 1955.]

*Decided June 18, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Arold H. Ripperger* for appellant.

*R. Lewis Bainder,* with whom was *James K. Cullen, Jr.,* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought in the Superior Court of Baltimore City by Hilda Louise Boehm against Louis Gail Fiege to recover for breach of a contract to pay the expenses incident to the birth of his bastard child and to provide for its support upon condition that she would refrain from prosecuting him for bastardy.

Plaintiff alleged in her declaration substantially as follows: (1) that early in 1951 defendant had sexual intercourse with her although she was unmarried, and as a result thereof she became pregnant, and defendant acknowledged that he was responsible for her pregnancy; (2) that on September 29, 1951, she gave birth to a female child; that defendant is the father of the child; and that he acknowledged on many occasions that he is its father; (3) that before the child was born, defendant agreed to pay all her medical and miscellaneous expenses and to compensate her for the loss of her salary caused by the child's birth, and also to pay her ten dollars per week for its support until it reached the age of 21, upon condition that she would not institute bastardy proceedings against him as long as he made the payments in accordance with the agreement; (4) that she placed the child for adoption on July 13, 1954, and she claimed the following sums: Union Memorial Hospital, $110; Florence Crittenton Home, $100; Dr. George Merrill, her physician, $50; medicines, $70.35; miscellaneous expenses, $20.45; loss of earnings for 26 weeks, $1,105; support of the child, $1,440; total, $2,895.80; and (5) that defendant paid her only $480, and she demanded that he pay her the further sum of $2,415.80, the balance due under the agreement, but he failed and refused to pay the same.

Defendant demurred to the declaration on the ground that it failed to allege that in September, 1953, plaintiff instituted bastardy proceedings against him in the Criminal Court of

Baltimore, but since it had been found from blood tests that he could not have been the father of the child, he was acquitted of bastardy. The Court sustained the demurrer with leave to amend.

Plaintiff then filed an amended declaration, which contained the additional allegation that, after the breach of the agreement by defendant, she filed a charge with the State's Attorney that defendant was the father of her bastard child; and that on October 8, 1953, the Criminal Court found defendant not guilty solely on a physician's testimony that "on the basis of certain blood tests made, the defendant can be excluded as the father of the said child, which testimony is not conclusive upon a jury in a trial court."

Defendant also demurred to the amended declaration, but the Court overruled that demurrer.

Plaintiff, a typist, now over 35 years old, who has been employed by the Government in Washington and Baltimore for over thirteen years, testified in the Court below that she had never been married, but that at about midnight on January 21, 1951, defendant, after taking her to a moving picture theater on York Road and then to a restaurant, had sexual intercourse with her in his automobile. She further testified that he agreed to pay all her medical and hospital expenses, to compensate her for loss of salary caused by the pregnancy and birth, and to pay her ten dollars per week for the support of the child upon condition that she would refrain from instituting bastardy proceedings against him. She further testified that between September 17, 1951, and May, 1953, defendant paid her a total of $480.

Defendant admitted that he had taken plaintiff to restaurants, had danced with her several times, had taken her to Washington, and had brought her home in the country; but he asserted that he had never had sexual intercourse with her. He also claimed that he did not enter into any agreement with her. He admitted, however, that he had paid her a total of $480. His father also testified that he stated "that he did not want his mother to know, and if it were just kept quiet, kept principally away from his mother and the public and the courts, that he would take care of it."

Defendant further testified that in May, 1953, he went to see plaintiff's physician to make inquiry about blood tests to show the paternity of the child; and that those tests were made and they indicated that it was not possible that he could have been the child's father. He then stopped making payments. Plaintiff thereupon filed a charge of bastardy with the State's Attorney.

The testimony which was given in the Criminal Court by Dr. Milton Sachs, hematologist at the University Hospital, was read to the jury in the Superior Court. In recent years the blood-grouping test has been employed in criminology, in the selection of donors for blood transfusions, and as evidence in paternity cases. The Landsteiner blood-grouping test is based on the medical theory that the red corpuscles in human blood contain two affirmative agglutinating substances, and that every individual's blood falls into one of the four classes and remains the same throughout life. According to Mendel's law of inheritance, this blood individuality is an hereditary characteristic which passes from parent to child, and no agglutinating substance can appear in the blood of a child which is not present in the blood of one of its parents. The four Landsteiner blood groups, designated as AB, A, B, and O, into which human blood is divided on the basis of the compatibility of the corpuscles and serum with the corpuscles and serum of other persons, are characterized by different combinations of two agglutinogens in the red blood cells and two agglutinins in the serum. Dr. Sachs reported that Fiege's blood group was Type O, Miss Boehm's was Type B, and the infant's was Type A. He further testified that on the basis of these tests, Fiege could not have been the father of the child, as it is impossible for a mating of Type O and Type B to result in a child of Type A.

Although defendant was acquitted by the Criminal Court, the Superior Court overruled his motion for a directed verdict. In the charge to the jury the Court instructed them that defendant's acquittal in the Criminal Court was not binding upon them. The jury found a verdict in favor of plaintiff for $2,415.80, the full amount of her claim.

Defendant filed a motion for judgment n. o. v. or a new

trial. The Court overruled that motion also, and entered judgment on the verdict of the jury. Defendant appealed from that judgment.

Defendant contends that, even if he did enter into the contract as alleged, it was not enforceable, because plaintiff's forbearance to prosecute was not based on a valid claim, and hence the contract was without consideration. He, therefore, asserts that the Court erred in overruling (1) his demurrer to the amended declaration, (2) his motion for a directed verdict, and (3) his motion for judgment n. o. v. or a new trial.

It was originally held at common law that a child born out of wedlock is *filius nullius,* and a putative father is not under any legal liability to contribute to the support of his illegitimate child, and his promise to do so is unenforceable because it is based on purely a moral obligation. Some of the courts in this country have held that, in the absence of any statutory obligation on the father to aid in the support of his bastard child, his promise to the child's mother to pay her for its maintenance, resting solely on his natural affection for it and his moral obligation to provide for it, is a promise which the law cannot enforce because of lack of sufficient consideration. *Mercer v. Mercer,* 87 Ky. 30, 7 S. W. 401; *Wiggins v. Keizer,* 6 Ind. 252; *Davis v. Herrington,* 53 Ark. 5, 13 S. W. 215. On the contrary, a few courts have stated that the natural affection of a father for his child and the moral obligation upon him to support it and to aid the woman he has wronged furnish sufficient consideration for his promise to the mother to pay for the support of the child to make the agreement enforceable at law. *Birdsall v. Edgerton,* 25 Wend., N. Y., 619; *Todd v. Weber,* 95 N. Y. 181, 47 Am. Rep. 20; *Trayer v. Setzer,* 72 Neb. 845, 101 N. W. 989.

However, where statutes are in force to compel the father of a bastard to contribute to its support, the courts have invariably held that a contract by the putative father with the mother of his bastard child to provide for the support of the child upon the agreement of the mother to refrain from invoking the bastardy statute against the father, or to abandon proceedings already commenced, is supported by sufficient con-

sideration. *Jangraw v. Perkins,* 77 Vt. 375, 60 A. 385; *Beach v. Voegtlen,* 68 N. J. L. 472, 53 A. 695; *Thayer v. Thayer,* 189 N. C. 502, 127 S. E. 553, 39 A. L. R. 428.

In Maryland it is now provided by statute that whenever a person is found guilty of bastardy, the court shall issue an order directing such person (1) to pay for the maintenance and support of the child until it reaches the age of eighteen years, such sum as may be agreed upon, if consent proceedings be had, or in the absence of agreement, such sum as the court may fix, with due regard to the circumstances of the accused person; and (2) to give bond to the State of Maryland in such penalty as the court may fix, with good and sufficient securities, conditioned on making the payments required by the court's order, or any amendments thereof. Failure to give such bond shall be punished by commitment to the jail or the House of Correction until bond is given but not exceeding two years. Code Supp. 1955, art. 12, sec. 8.

Prosecutions for bastardy are treated in Maryland as criminal proceedings, but they are actually civil in purpose. *Kennard v. State,* 177 Md. 549, 10 A. 2d 710; *Kisner v. State,* 209 Md. 524, 122 A. 2d 102. While the prime object of the Maryland Bastardy Act is to protect the public from the burden of maintaining illegitimate children, it is so distinctly in the interest of the mother that she becomes the beneficiary of it. Accordingly a contract by the putative father of an illegitimate child to provide for its support upon condition that bastardy proceedings will not be instituted is a compromise of civil injuries resulting from a criminal act, and not a contract to compound a criminal prosecution, and if it is fair and reasonable, it is in accord with the Bastardy Act and the public policy of the State.

Of course, a contract of a putative father to provide for the support of his illegitimate child must be based, like any other contract, upon sufficient consideration. The early English law made no distinction in regard to the sufficiency of a claim which the claimant promised to forbear to prosecute, as the consideration of a promise, other than the broad distinction between good claims and bad claims. No promise to forbear to prosecute an unfounded claim was sufficient consideration.

In the early part of the Nineteenth Century, an advance was made from the criterion of the early authorities when it was held that forbearance to prosecute a suit which had already been instituted was sufficient consideration, without inquiring whether the suit would have been successful or not. *Longridge v. Dorville*, 5 B. & Ald. 117.

In 1867 the Maryland Court of Appeals, in the opinion delivered by Judge Bartol in *Hartle v. Stahl*, 27 Md. 157, 172, held: (1) that forbearance to assert a claim before institution of suit, if not in fact a legal claim, is not of itself sufficient consideration to support a promise; but (2) that a compromise of a doubtful claim or a relinquishment of a pending suit is good consideration for a promise; and (3) that in order to support a compromise, it is sufficient that the parties entering into it thought at the time that there was a *bona fide* question between them, although it may eventually be found that there was in fact no such question.

We have thus adopted the rule that the surrender of, or forbearance to assert, an invalid claim by one who has not an honest and reasonable belief in its possible validity is not sufficient consideration for a contract. 1 *Restatement, Contracts*, sec. 76(b). We combine the subjective requisite that the claim be *bona fide* with the objective requisite that it must have a reasonable basis of support. Accordingly a promise not to prosecute a claim which is not founded in good faith does not of itself give a right of action on an agreement to pay for refraining from so acting, because a release from mere annoyance and unfounded litigation does not furnish valuable consideration.

Professor Williston was not entirely certain whether the test of reasonableness is based upon the intelligence of the claimant himself, who may be an ignorant person with no knowledge of law and little sense as to facts; but he seemed inclined to favor the view that "the claim forborne must be neither absurd in fact from the standpoint of a reasonable man in the position of the claimant, nor, obviously unfounded in law to one who has an elementary knowledge of legal principles." 1 *Williston on Contracts*, Rev. Ed., sec. 135. We agree that while stress is placed upon the honesty and good faith of

the claimant, forbearance to prosecute a claim is insufficient consideration if the claim forborne is so lacking in foundation as to make its assertion incompatible with honesty and a reasonable degree of intelligence. Thus, if the mother of a bastard knows that there is no foundation, either in law or fact, for a charge against a certain man that he is the father of the child, but that man promises to pay her in order to prevent bastardy proceedings against him, the forbearance to institute proceedings is not sufficient consideration.

On the other hand, forbearance to sue for a lawful claim or demand is sufficient consideration for a promise to pay for the forbearance if the party forbearing had an honest intention to prosecute litigation which is not frivolous, vexatious, or unlawful, and which he believed to be well founded. *Snyder v. Cearfoss,* 187 Md. 635, 643, 51 A. 2d 264; *Pullman Co. v. Ray,* 201 Md. 268, 94 A. 2d 266. Thus the promise of a woman who is expecting an illegitimate child that she will not institute bastardy proceedings against a certain man is sufficient consideration for his promise to pay for the child's support, even though it may not be certain whether the man is the father or whether the prosecution would be successful, if she makes the charge in good faith. The fact that a man accused of bastardy is forced to enter into a contract to pay for the support of his bastard child from fear of exposure and the shame that might be cast upon him as a result, as well as a sense of justice to render some compensation for the injury he inflicted upon the mother, does not lessen the merit of the contract, but greatly increases it. *Hook v. Pratt,* 78 N. Y. 371, 34 Am. Rep. 539; *Hays v. McFarlan,* 32 Ga. 699, 79 Am. Dec. 317.

A case in point is *Pflaum v. McClintock,* 130 Pa. 369, 18 A. 734. That was an action to collect a judgment bond which the defendant signed when he was in jail to settle a fornication and bastardy case. The defendant claimed that the bond was conditioned on the support of a child expected to be born, but that he was innocent of the charge, and that in fact the obligee had not given birth to any living child, but died without issue before the judgment was entered. The Supreme Court of Pennsylvania decided that the bond was supported by a good consideration.

Another analogous case is *Thompson v. Nelson,* 28 Ind. 431. There the plaintiff sought to recover back money which he had paid to compromise a prosecution for bastardy. He claimed that the prosecuting witness was not pregnant and therefore the prosecution was fraudulent. It was held by the Supreme Court of Indiana, however, that the settlement of the prosecution was a good consideration for the payment of the money and it could not be recovered back, inasmuch as it appeared from the evidence that the prosecution was instituted in good faith, and at that time there was reason to believe that the prosecuting witness was pregnant, although it was found out afterwards that she was not pregnant.

Likewise, in *Heaps v. Dunham,* 95 Ill. 583, 590, the Supreme Court of Illinois held that a man charged with bastardy may compromise the claim with the woman who claims to be pregnant, and if the man, after being arrested, enters into a settlement not induced by fraud or oppression and gives his promissory note for the benefit of the woman and child, such a contract is supported by a good consideration. In explanation of its ruling, the Court said:

> "But while there is great doubt from the evidence whether Lavina Snell was pregnant, yet so far as the charge of bastardy is concerned, as complainant voluntarily settled and gave his notes in settlement of the prosecution which had been commenced against him, he must be concluded by that settlement. When arrested on the charge he had the right to contest the case and require strict proof to sustain the charge, but under our statute a charge of this character may be settled between the prosecuting witness and defendant, and when a settlement has been made without fraud or oppression, we think it should be conclusive and binding between the parties."

In the case at bar there was no proof of fraud or unfairness. Assuming that the hematologists were accurate in their laboratory tests and findings, nevertheless plaintiff gave testimony which indicated that she made the charge of bastardy against defendant in good faith. For these reasons the Court

acted properly in overruling the demurrer to the amended declaration and the motion for a directed verdict.

Finally, in attacking the action of the Court in overruling the motion for judgment n. o. v. or a new trial, defendant made the additional complaint that there was error in the charge to the jury. As we have said, the Court instructed the jury that defendant's acquittal in the Criminal Court was not binding upon the jury in the case before them. Defendant urged strongly that he had been acquitted by the Criminal Court in consequence of scientific findings from blood tests.

It is immaterial whether defendant was the father of the child or not. In the light of what we have said, we need not make any specific determination on this subject, as defendant took only one exception to the Court's charge, and his only objection was the general one that the charge did not refer to "a valid binding agreement in law."

The Court then gave the jury the following additional instruction:

"Members of the Jury: Counsel for the defendant has asked me to add one point to the charge that I have just given you. He has asked me to instruct you that there must be a valid binding agreement.

"There has been some testimony from the defendant that he was forced to make an agreement. In fact, I think in fairness to the defendant I should say that he definitely denies having made that agreement.

"Now, there is a defense in the law of contracts called duress. If you enter into a contract as a result of coercion, or force or threats it might be an invalid agreement. * * *

"So that, in fairness to both sides, I add to my instruction that even if the defendant has admitted making an agreement—and I leave that to your recollection of the facts—if you feel that the agreement was invalid by reason of his having been forced to it, then there should not be such an agreement that he should be forced to adhere to it."

The Court then asked the attorneys if they were ready for

argument. There was no further exception to the charge. Counsel on both sides informed the Court that they were ready to argue the case to the jury. Before the jury retires to consider its verdict, a party may object to any portion of any instruction given, or to any omission therefrom, or to the failure to give any instruction, stating distinctly the portion, or omission, or failure to instruct, to which he objects and the specific grounds of his objection. On appeal a party, in assigning error in the instructions, is restricted to (1) the particular portion of the instructions given, or the particular omission therefrom, or the particular failure to instruct, distinctly objected to before the jury retired, and (2) the specific grounds of objection distinctly stated at that time. Under our rules, no other errors or assignments of error in the instructions are considered by the Court of Appeals. General Rules of Practice and Procedure, part 3, subd. 3, rule 6; *State Roads Commission of Maryland v. Berry,* 208 Md. 461, 469, 118 A. 2d 649, 653.

As we have found no reversible error in the rulings and instructions of the trial Court, we will affirm the judgment entered on the verdict of the jury.

*Judgment affirmed, with costs.*