Edward E. GATZ; Dennis C. Russell; Marvin J. Frank; Earl R. Willats; Jack Shelley, James J. and Patricia Phalen; Marlene W. Hechtman; Vale H. Sorensen; Larry E. Haack; Raymond G. and Dorothy Alvine,

William Chapman, Appellant,

Glenn A. Goodrich; Allen E. Zencka; Joseph Lynch; Vincent Runco; Larry L. Hald; Donald D. Kerr; Kermit A. Brashear, II; Peter D. Knott; Dennis D. Weiss; William Wolfe; Frank Cernik; Frank Cernik, Trustee; and Buckeye Pizza Corporation

v.

SOUTHWEST BANK OF OMAHA; Packers National Bank; Security National Bank of Omaha; Bank of Millard; U.S. National Bank of Omaha; First West Side Bank; The Omaha National Bank; Northwestern National Bank; First National Bank of Omaha; Center Bank; American National Bank; Bank of the Midlands; Ames Bank and First Westroad Bank, Appellees,

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn Square Bank, N.A., Intervenor.

Edward E. GATZ; Dennis C. Russell; Marvin J. Frank; Earl R. Willats; Jack Shelley; James J. and Patricia Phalen; Marlene W. Hechtman; Vale H. Sorensen; Larry E. Haack; Raymond G. and Dorothy Alvine,

William Chapman, Appellant,

Glenn A. Goodrich; Allen E. Zencka; Joseph Lynch; Vincent Runco; Larry L. Hald; Donald D. Kerr; Kermit A. Brashear, II; Peter D. Knott; Dennis D. Weiss; William Wolfe; Frank Cernik; Frank Cernik, Trustee; and Buckeye Pizza Corporation

v.

SOUTHWEST BANK OF OMAHA; Packers National Bank; Security National Bank of Omaha; Bank of Millard; U.S. National Bank of Omaha; First West Side Bank; The Omaha National Bank;

Northwestern National Bank (now known as Norwest Bank Nebraska N.A.) Appellant,

First National Bank of Omaha; Center Bank; American National Bank; Bank of the Midlands; and Ames Bank; First Westroads Bank

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn Square Bank, N.A., Appellee.

Nos. 86–2554, 87–1094.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 2, 1987.

Decided Jan. 4, 1988.

Rehearing Denied March 4, 1988.

Thomas H. Dahlk, Omaha, Neb., for appellant.

Richard B. Noulles, Tulsa, Okl., for appellees.

Before BOWMAN, Circuit Judge, ROSS, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

William Chapman (Chapman) appeals from a district court judgment against him and in favor of Continental Illinois National Bank and Trust Company of Chicago (CINB) pursuant to the summary enforcement of a settlement agreement. In a consolidated appeal, Norwest Bank Nebraska, N.A. (Norwest) appeals from a district court judgment that ordered Norwest to pay the face amount of a letter of credit issued on behalf of Chapman. We affirm both judgments.[1]

## I.

On June 15, 1982, in the course of securities litigation, Chapman and certain other investors in various Longhorn oil and gas programs (collectively referred to as Nebraska investors) obtained a state court injunction that prohibited various banks, including Norwest, from honoring drafts on letters of credit issued by the banks to Penn Square Bank, N.A. (PSB) on behalf of the individual investors.

PSB was declared insolvent on July 5, 1982. The Federal Deposit Insurance Corporation (FDIC), as PSB's receiver, intervened in the lawsuit and removed it to federal court. Thereafter, the case was consolidated with other cases involving Longhorn oil and gas drilling programs and was transferred to the United States District Court for the Western District of Oklahoma for further pretrial proceedings. *In re Longhorn Securities Litigation*, 552 F.Supp. 1003 (J.P.M.D.L.1983).

On April 22, 1985, the FDIC and the Nebraska investors reached an oral settlement at a settlement conference held in Oklahoma City before United States District Judge Lee West. Chapman was the chief negotiator for the Nebraska investors at the settlement conference. Later reduced to writing, the settlement agreement required each Nebraska investor to either (1) make an immediate cash payment to CINB in an amount equal to 85% of the investor's letter of credit amount, plus interest, or (2) furnish a promissory note in an amount equal to "the Letter of Credit Amount for each investment shown for the Plaintiff on Exhibit A * * * payable to the order of Continental Illinois Bank and Trust Company of Chicago as Administrator for the FDIC." Record at 20–21. Exhibit A was entitled "NEBRASKA PLAINTIFFS WHO HAVE ENTERED INTO THIS SETTLEMENT AGREEMENT FOR THOSE INVESTMENTS LISTED."[2] Although Chapman also had investments in the 1978–II and 1979–I Longhorn programs, Exhibit A reflected only his invest-

---

1. The Honorable C. Arlen Beam, Chief Judge, United States District Court for the District of Nebraska.

2. For each investment, Exhibit A listed the investor, the total amount of the investment, the letter of credit amount, and the discounted amount, which was the amount payable under the lump sum option.

ment in the Longhorn 1980 Private Drilling Program (1980 PDP).

To effectuate settlement, an investor electing a long-term payment option was to furnish "a separate original fully executed promissory note for each one of [his] investments as set forth on Exhibit A." Record at 35. Chapman executed and returned the signature page, together with a promissory note payable to CINB in the amount of $190,500 and a check for the first quarter's interest on that note as required by the settlement agreement.

The original settlement agreement also provided that investors choosing the long-term option "shall provide as collateral for those Plaintiffs' promissory notes such plaintiff's aggregate ownership interest as reflected on Exhibit E" in two zero coupon bonds with face amounts totaling $2,589,-000. Record at 21–22. The settlement agreement further provided that:

> [T]he portion of the bonds pledged by those plaintiffs selecting the Long–Term Payments option will at maturity pay * * * in no event less than the aggregate amounts of the Promissory Notes signed by Plaintiffs selecting the Long–Term Payments option. A certificate(s) representing the portion of the Bonds pledged by Plaintiffs selecting the Long–Term Payments option shall be reissued and shall be made payable to CINB and shall be held by CINB as collateral securing the payment of the promissory notes * * *.

Record at 22.

The reissuance of a single certificate for all investors proved unwieldy. The parties agreed to amend the settlement agreement to provide that a separate certificate would be furnished for each investor and that each investor's promissory note would be collaterized only by his percentage interest in the zero coupon bonds. When it was later discovered that the amendment created a shortfall in Chapman's collateral, the FDIC and CINB requested that Chapman furnish additional collateral or pay off the excess portion of his note. Chapman responded that he would re-execute a $155,-000 note and pay eighty-five percent of the

excess "in consideration of the FDIC and Continental's release of all other claims relating to Longhorn with the exception of the $155,000 note." Record at 60. The FDIC rejected Chapman's proposal because it still had claims against Chapman relative to his investments in the Longhorn 1978–II and 1979–I programs. Chapman, however, maintained that the other Longhorn claims were also covered by the settlement agreement.

A settlement conference was held to resolve this and other disputes. At the conference, the FDIC and CINB apparently withdrew their request that Chapman furnish additional collateral. Chapman, however, persisted in his contention that the settlement agreement also released claims against him relative to his investments in the 1978–II and 1979–I Longhorn programs.

The FDIC and CINB made a motion seeking to enforce the settlement agreement and to dissolve a temporary injunction that prevented Norwest from paying on a letter of credit it had issued on Chapman's behalf. On October 30, 1986, the district court summarily enforced the settlement agreement and entered a judgment against Chapman and in favor of CINB. On November 19, 1986, the district court entered an order dissolving the injunction and directing Norwest to either pay the face amount of the letter of credit within ten days or show cause why the letter of credit should not be paid. After determining that Norwest had not shown an adequate defense to liability, the district court ordered Norwest to pay the face amount of the letter of credit to the FDIC on December 10, 1986.

## II.

Chapman argues that the district court erred in entering a judgment in favor of CINB, a nonparty to the litigation. The settlement agreement was between the FDIC, in its capacity as PSB's receiver, and the plaintiffs listed in Exhibit A, including Chapman. The agreement provided that CINB was to be the payee of any checks submitted under the cash payment option

or of any promissory notes submitted under the long-term payment option. Chapman asserts that an interest in the settlement does not confer party status on CINB and that CINB's failure to intervene under Fed.R.Civ.P. 24 precludes entry of judgment in its favor.

■ Although some courts have held that it is reversible error to enter a judgment in favor of one who has failed to formally intervene, we have been willing to overlook a technical failure to comply with Fed.R.Civ.P. 24(c) in appropriate circumstances. *See Roach v. Churchman*, 457 F.2d 1101, 1104 (8th Cir.1972). Such lenience is appropriate when the facts and allegations sufficiently apprise the parties of the relevant claim. *Spring Constr. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir.1980). CINB joined in the FDIC's motion to enforce the settlement agreement, was designated by the settlement agreement as "Administrator for Federal Deposit Insurance Corporation," record at 18, and was the payee of the promissory note tendered by Chapman pursuant to the settlement agreement. Under these circumstances, we conclude that it was within the discretion of the district court to treat the motion to enforce the settlement agreement also as a motion to intervene and to accept CINB as a party to the suit. *Compare Farina v. Mission Inv. Trust*, 615 F.2d 1068, 1075 (5th Cir.1980) (although the FDIC failed to formally intervene, it was within the district court's discretion to treat its motion to remove also as a motion to intervene).

### III.

Chapman also contends that the district court misinterpreted the language of the settlement agreement in limiting its scope to those investments listed in Exhibit A. We disagree.

■ The settlement agreement was entered into between the FDIC and "Plaintiffs listed on Exhibit 'A'." Record at 18. Exhibit A, entitled "NEBRASKA PLAINTIFFS WHO HAVE ENTERED INTO THIS SETTLEMENT AGREEMENT FOR THOSE INVESTMENTS LISTED," listed the programs included in the settlement agreement: (1) Longhorn 1979–II Drilling Program, (2) Longhorn 1980 Private Drilling Program (1980 PDP), (3) Longhorn & Associates, Ltd., and (4) Longhorn Developmental Program, Ltd. Under each program, Exhibit A listed the following information relative to each individual investor: (1) his name, (2) the total amount of his investment, (3) the letter of credit amount, and (4) the discounted amount, which was the amount payable under the lump-sum option. Chapman was only listed under the 1980 PDP program, where his total investment amount was stated as $200,000, his letter of credit amount, including an additional $40,500 note, was $190,500, and the discounted amount was $161,925. No investments in the Longhorn 1978–II and 1979–I programs appear in Exhibit A. We find that these provisions clearly and unambiguously establish that only Chapman's investment in 1980 PDP was included in the settlement agreement.

This conclusion is reinforced by two other settlement agreement provisions. First, paragraph IIE of the agreement stated:

Each Plaintiff and FDIC warrants and represents that, to the best of his, her or its knowledge, information and belief, (i) the amount(s) shown on Exhibit "A" in the column entitled "Total Amount of Investment" beside such Plaintiff's name correctly reflects with respect to those investments included in this Settlement Agreement, the amount(s) of such Plaintiff's investment(s) in the Longhorn Partnership(s), and (ii) unless otherwise noted on Exhibit "A", the amount(s) shown on Exhibit "A" in the "Letter of Credit Amount" column beside such Plaintiff's name correctly reflects the portion of such investment(s) for which letter(s) of credit were given to PSB.

Record at 20. According to this language, Exhibit A listed the total investment amount for each investment included in the settlement agreement. Therefore, investments not appearing on Exhibit A were outside the scope of the agreement.

Second, paragraph nine of the signature page to the settlement agreement stated:

I represent that all information on Exhibit "A", as to my investment(s) in the Longhorn Partnership(s), the Total Amount of Investment, Letter of Credit Amount and Discounted Amount is accurate and that my letter of credit is enjoined and/or unpaid, except as described below * * *.

Record at 36. Chapman listed no exceptions in his execution of the signature page. This provision, read in conjunction with Exhibit A and paragraph IIE above, required Chapman to list information relative to the 1978–II and 1979–I programs in the space provided if such programs were included in the settlement agreement.

Chapman argues that Exhibit A listed only those investments on which letters of credit were outstanding and did not represent a list of those investments subject to the settlement agreement. He concludes that his investments in the 1978–II and 1979–I programs were included in the settlement agreement because those programs were included in Exhibit B, entitled "BANKRUPTCY PROCEEDINGS INVOLVING LONGHORN PARTNERSHIPS," and were excluded from Exhibit A only because they did not have outstanding letter of credit amounts. Chapman bases this argument on the settlement agreement language defining "Letter of Credit Amount":

"Letter of Credit Amount" means the amount listed for a Plaintiff in the "Letter of Credit Amount" column of Exhibit "A". In the event a Plaintiff is listed more than once on Exhibit "A", the "Letter of Credit Amount" shall be the aggregate amount listed in such column for such Plaintiff for all investments on Exhibit "A" as to which the Settlement Agreement was accepted.

Record at 18. We disagree with Chapman's analysis. This provision was merely included to define the term "Letter of Credit Amount" for the purposes of the settlement agreement. Neither this definitional provision, nor Exhibit B, which listed the Longhorn partnerships involved in bankruptcy proceedings, in any way define the scope of the settlement agreement.

Chapman's remaining arguments concerning the meaning of the settlement agreement are equally without merit. Chapman argues that paragraph IID, which provided that "this Settlement Agreement [was] entered into solely to avoid the time, expense and uncertainty of continued litigation," record at 20, indicates that all of his Longhorn investments were included in the settlement agreement. Chapman reads too much into this provision, which does not contradict and is equally consistent with limiting the scope of the settlement agreement to those investments listed in Exhibit A. Chapman also argues that the FDIC's claims relative to his investments in the 1978–II and 1979–I programs, which arose out of assumption agreements, were extinguished because the FDIC's agreement not to enforce assumption agreements was not limited to the investments listed in Exhibit A. Chapman is incorrect, however, because the settlement agreement states that the FDIC's agreement not to enforce assumption agreements is "effective * * * only as to an assumption agreement * * * relating to an investment with respect to which this Settlement Agreement has been accepted * * *." Record at 25. As discussed above, the scope of the settlement agreement is limited to those investments listed in Exhibit A.

## IV.

In addition, Chapman argues that the district court erred in summarily enforcing the settlement agreement because in doing so it failed to consider evidence indicating that he subjectively intended the scope of the settlement agreement to include the Longhorn 1978–II and 1979–I programs, as well as 1980 PDP. Chapman asserts that his intent concerning the scope of the settlement agreement precluded a meeting of the minds, which is essential to the formation of a contract. Alternatively, Chapman argues that his mistake concerning the scope of the agreement makes the settlement agreement unenforceable. We disagree.

A district court has the inherent power to summarily enforce a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed. 2d 140 (1976). The district court must hold an evidentiary hearing, however, when there is a substantial factual dispute concerning the existence or terms of the settlement agreement, *Callie v. Near,* 829 F.2d 888, 890 (9th Cir.1987), or when the situation presents complex factual issues. *Hobbs & Co., Inc. v. Am. Investors Management, Inc.,* 576 F.2d 29, 34 (3rd Cir.1978).

Disputes concerning this settlement agreement are governed by Oklahoma contract law. *See Mico, Inc. v. Wagner Elec. Corp.,* 802 F.2d 322, 323 (8th Cir.1986); record at 29. In the absence of fraud, mistake, or accident, Oklahoma law is clear:

> [W]here a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended. The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the contractual instrument in question.

*Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 529 (Okla.1985) (emphasis and footnote omitted); *accord Cook v. Oklahoma Bd. of Pub. Affairs,* 736 P.2d 140, 147 (Okla.1987). Therefore, since we have determined that the scope of the settlement agreement is clear and unambiguous, parol evidence of Chapman's subjective intent is inadmissible to show that his intent differed from the language of the settlement agreement.

Alternatively, Chapman argues that his mistake as to the scope of the settlement agreement makes it unenforceable and that, in this respect, evidence of his subjective intent is not barred by the parol evidence rule. Mistake is an affirmative defense to the enforcement of a contract under Oklahoma law. *Albert & Harlow, Inc. v. Fitzgerald,* 389 P.2d 994, 996–97 (Okla.1964). A unilateral mistake, however, uaccompanied by fraud, misrepresentation, concealment, or other misleading incident in the formation of a settlement agreement, is insufficient to invalidate the agreement under Oklahoma law, provided both parties had the same access to knowledge concerning the disputed provisions. *L. E. Smith Constr. Co. v. Bearden Plumbing and Heating Co.,* 372 P.2d 229, 232 (Okla. 1962); *cf. Watkins v. Grady County Soil and Water Conservation Dist.,* 438 P.2d 491, 495 (Okla. 1968) (easement cancelled based on unilateral mistake accompanied by misrepresentation); *Womble v. Mahoney,* 383 P.2d 26, 30 (Okla. 1963) (unilateral mistake accompanied by inequitable conduct by the other party resulted in cancellation of deed). In the absence of such inequitable conduct, a mutual mistake [3] is required to impeach a settlement agreement. *L. E. Smith Constr. Co.,* 372 P.2d at 232. Accordingly, since Chapman has pled a unilateral mistake but has not alleged inequitable conduct on the part of the FDIC, he has not pled an affirmative defense to the enforcement of the settlement agreement.

We conclude that summary enforcement of the settlement agreement was proper because the agreement was clear and unambiguous and there were no substantial factual issues to be resolved by an evidentiary hearing.

## V.

Finally, Chapman contends that the district court erred in ordering Norwest to make payment on the $150,000 letter of credit. Chapman cites the following settlement agreement language in support of the proposition that the settlement agreement extinguished the letter of credit liability: "No funds shall be advanced to a Plaintiff who elects the Long–Term Payments Op-

---

**3.** A mistake is mutual if it is "reciprocal and common to both parties, each laboring under the same misconception as to the terms of the contract. A crucial element is thus whether both parties are laboring under the same misconception." *Reid v. Graybeal,* 437 F.Supp. 24, 28 (W.D.Okla.1977).

tion, it being agreed that the promissory note being given by such Plaintiff is in substitution of existing liability." Record at 21.

Chapman's argument is inconsistent with other settlement agreement language, which provided that any "letter(s) of credit given to PSB in connection with the Plaintiff's investment(s) in the Longhorn Partnership(s)" would not be cancelled and returned to the respective Plaintiff until an affirmative determination had been made. Record at 24. Affirmative determination refers to a determination "by FDIC and CINB that the cash payment or promissory note received by it from such Plaintiff and the collateral [was] in proper form and amount," or that such requirements had been waived. Record at 23–24. Accordingly, because Chapman neither delivered the proper collateral nor obtained a waiver of that requirement, the letter of credit liability was not extinguished.

■ Chapman also argues that the election of remedies provision under U.C.C. § 3–802 precludes enforcement of the letter of credit because the FDIC and CINB elected to enforce the promissory note. This argument is a misapplication of U.C.C. § 3–802, which concerns the choice between enforcing the note or the underlying contract. An issuing bank's obligation under a letter of credit is completely independent of the underlying transaction. *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 15 (2nd Cir.1979).

■ Finally, Chapman contends that summary enforcement of the letter of credit was improper. We disagree. Because the letter of credit is a contract separate and distinct from the underlying transaction or the settlement agreement, it is irrelevant that Norwest was not a party to the settlement agreement. On November 19, 1986, the district court ordered Norwest to pay the letter of credit or to show cause why it should not be paid. Record at 85. On December 10, 1986, the district court concluded that Norwest "ha[d] not shown that it ha[d] an adequate defense to liability under the letter of credit." Record at 85A. Norwest has not presented us with a

reason to question the district court's conclusion.

The judgments are affirmed.