653 A.2d 484

NATIONWIDE MUTUAL INSURANCE COMPANY

v.

Kenneth VOLAND.

No. 640 Sept. Term, 1994.

Court of Special Appeals of Maryland.

Feb. 6, 1995.

William F. Fanton, III, Towson, for appellant.

Darren L. Kadish (Eugene A. Shapiro, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and CATHELL and HOLLANDER, JJ.

HOLLANDER, Judge.

The Circuit Court for Baltimore County granted a Motion to Enforce Settlement filed by Kenneth Voland, appellee, against Nationwide Mutual Insurance Company, appellant. From an order directing payment of $5,000 plus interest to Voland, Nationwide has appealed. For the reasons discussed below, we shall affirm.

### Factual Background

The material facts are undisputed. On December 5, 1991, Voland was involved in an automobile collision with Douglas Franklin. On September 17, 1992, Voland sued Franklin in the Circuit Court for Baltimore County to recover for injuries he sustained in the accident. An Amended Complaint adding Nationwide as a defendant was filed on May 3, 1993 and served on May 12, 1993. In the Amended Complaint, Voland alleged that Nationwide, his own insurance carrier, had breached the uninsured-motorist ("UM") and underinsured-motorist ("UIM") clauses of its insurance policy by denying Voland's claim for damages in excess of Franklin's insurance policy limits.

On May 4, 1993, State Farm Mutual Automobile Insurance Co., Franklin's insurance carrier, extended an offer to settle Voland's case for $50,000, which constituted the limit of Franklin's liability coverage. Voland's counsel accepted the offer on May 27, 1993, but did not inform Nationwide of that settlement. Thereafter, on June 3, 1993, Voland signed a one-page "Release." [1] Counsel for both Voland and Franklin also

---

1. The Release does not mention Franklin or his insurer by name. It provides, in pertinent part, for the release of "heirs, executors, adminis-

executed a Stipulation of Dismissal.[2]

In a letter dated June 3, 1993, Nationwide sent Voland's counsel a request for a settlement demand. Voland's attorney responded, on June 15, 1993, with a demand of $25,000. Nationwide then filed its Answer on June 24, 1993. Subsequently, on July 13, 1993, Nationwide's claims representative offered $5,000 in settlement which Voland's attorney accepted. Although Nationwide issued a check to Voland that same day, it never sent the check.

The parties agree that, as of July 13, 1993, Voland's counsel had not informed Nationwide of Voland's settlement with Franklin, but he did not make any false statements to Nationwide or otherwise actively conceal facts from the insurer. Further, Nationwide's claims representative did not inquire as to the status of the underlying tort litigation before reaching an agreement with Voland's attorney, even though it had known for several months of Voland's suit against Franklin.

On July 21, 1993, Nationwide learned of the settlement agreement between Voland and Franklin through Franklin's attorney. Several weeks later, when Voland inquired as to the status of Nationwide's settlement check, Nationwide advised that it would not pay the money; in its view, Voland had breached the insurance contract by failing to obtain Nationwide's consent prior to settling with Franklin. Based on Voland's execution of the Release, Nationwide also contended that its subrogation rights had been compromised.[3] Accord-

---

trators, agents and assigns, and all other persons, firms or corporations liable or who might be claimed to be liable...."

2. Voland's counsel wrote in the transmittal letter of June 1, 1993, "Since Nationwide has not yet filed an Answer, I think the Stipulation can simply be filed with both of our·signatures." In actuality, the Stipulation of Dismissal was stamped on July 7, 1993, *after* the date that Nationwide filed its Answer, and the court file reflects that it was docketed on July 14, 1993.

3. The relevant portion of the "Exclusion" clause in the Nationwide policy states: "This Uninsured Motorists insurance does not apply ... if the insured or legal representative settles, without our written consent,

ingly, on August 26, 1993, Voland filed a Motion to Enforce Settlement, which was heard by Judge Robert E. Cahill on March 11, 1994.

In its opinion of March 21, 1994, the trial court concluded that neither the Release nor the Stipulation of Dismissal vitiated the settlement agreement.[4] The court further noted that the UM/UIM endorsement did not expressly require Voland to advise Nationwide of the status of his suit against Franklin. The court thus framed the issue in the following way:

> The question to be decided, therefore, is whether Nationwide had a duty to determine the status of the tort case before it agreed to settle with the plaintiff. If it did, it will be deemed to have waived its right to rely on the language in the exclusion as the basis for revoking its settlement agreement.

The court determined that its decision was controlled by paragraph 8 of the "Limits and Conditions of Payment" section of the policy. It provides: "We will not pay any underinsured motorists loss until the limits of all bodily injury liability coverage available from any source *have been exhausted by payment of settlements* or judgments." (Emphasis added). The court interpreted this language to mean that Nationwide would not be obliged to pay any claims under the

---

with any party who may be liable." The "Trust Agreement" clause of the policy states, in pertinent part: "The insured will hold in trust for us his rights of recovery against such [legally liable] party. The insured will do whatever is proper to secure such rights, and will do nothing to prejudice them." The policy also defines "Uninsured Motorists" as encompassing underinsured motorists.

**4.** As to the Release, the court quoted *Globe American Casualty v. Chung,* 76 Md.App. 524, 544, 547 A.2d 654 (1988), *vac. on other grounds,* 322 Md. 713, 589 A.2d 956 (1991): "To interpret the [general] release as absolving the appellant from liability on its contractual obligation to the appellee would be giving the appellant a gratuitous windfall not remotely contemplated by the parties to the release." As to the Stipulation, the trial court concluded, based on Md.Rule 2–506(a), that it applied only to Count I of the Amended Complaint (the negligence claim against Franklin) but not Count II (the contract claim against Nationwide).

UIM clause until *after* its insured had exhausted the tortfeasor's insurance coverage. As applied to this case, the court determined that Voland's receipt of the policy limits from Franklin's insurance carrier was a "condition precedent" to Nationwide's duty to pay under the UIM clause. Accordingly, the court held that Nationwide either knew that the condition precedent had been satisfied or had waived its right to be told of it. Consequently, the court ordered Nationwide to pay Voland $5,000 plus interest from July 13, 1993.[5]

### Issues Presented

Nationwide presents the following issues for our consideration:

1. "When the insurance contract between [Voland] and [Nationwide] clearly requires in its 'Trust Agreement' section that [Voland] do nothing to prejudice [Nationwide's] rights of recovery against a tortfeasor, was it error for the trial judge to find that the general release and Stipulation of Dismissal signed by [Voland] in conjunction with a settlement with [Franklin] did not breach the insurance contract and therefore did not vitiate [Nationwide's] later settlement with [Voland]?"

2. "When [Nationwide's] insurance policy contains a coverage exclusion which requires [Nationwide's] consent to [Voland's] settlement with any liable party before [Nationwide's] Underinsured Motorist insurance will apply, and [Nationwide] is unaware of a prior settlement between [Voland] and [Franklin], was it error for the trial judge to

---

**5.** The court also noted that, if it had to decide the merits of Nationwide's breach of contract claim, it would conclude that Voland had not breached the "Exclusion" and "Trust Agreement" clauses of the insurance policy by failing to notify Nationwide of the settlement. The court distinguished the purposes of the UM and UIM clauses of the policy, and concluded that the Exclusion and Trust Agreement clauses logically apply only to *uninsured* motorist coverage. The court said that the Exclusion and Trust Agreement provisions do not apply to payments made in excess of the tortfeasor's liability coverage. Accordingly, the court decided that Voland would have had no duty to protect Nationwide's subrogation rights under these two clauses.

find that if [Nationwide] had a duty to determine the status of the underlying tort case before it agreed to its own settlement with [Voland], that it waived its right to rely upon the language in the exclusion as the basis for revoking its settlement agreement?"

3. "Although not conclusively determined in the ruling, was the trial judge in error when he found that [Nationwide's] Exclusion and Trust Agreement provisions apply only to the uninsured motorist and have no application to payments made in excess of the limit of the tortfeasor's liability coverage?"

Voland frames the issues as follows:

1. "Was the settlement agreement entered into by both parties binding upon. [Nationwide]?"

2. "Does [Nationwide's] 'Trust Agreement' provision in its policy conflict with the purpose of Underinsured Motorist coverage?"

We answer Voland's first issue in the affirmative and, consequently, we answer Nationwide's first issue in the negative. We hold that Nationwide's settlement agreement was valid and enforceable. With respect to the enforceability of the settlement agreement, we conclude that Voland's counsel had no affirmative duty to disclose his earlier settlement with Franklin. If Voland's suit against Nationwide had not settled and, instead, proceeded to trial, Nationwide may have had a meritorious claim or defense, whether based on the insurance policy or otherwise. As the enforceability of the parties' settlement agreement does not turn on the language of the insurance policy, we decline to answer any of the remaining issues.

### Discussion

■ An agreement to settle a lawsuit is a contract and is governed by ordinary contract principles. *See Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982). It is undisputed here that the parties had agreed to settle; the terms required Nationwide to pay Voland $5,000 in exchange for Voland's

agreement to dismiss, with prejudice, his breach of contract claim against Nationwide.

■ As we have noted, Nationwide argues that, prior to accepting Nationwide's settlement offer, Voland had an affirmative duty under the insurance policy to disclose that he had settled with Franklin, executed the Release, and filed the Stipulation of Dismissal. Nationwide contends that it would never have offered to settle had it known of the Release [6] and, due to Voland's breach of contract, it had no obligation to pay anything under the UM/UIM clauses of the policy. Therefore, Nationwide concludes, Voland's breach rendered the settlement unenforceable. Nationwide also argues that it had no duty to investigate and apprise itself of the status of the underlying litigation, and that its ignorance of the status of that case—a unilateral mistake of fact—entitles Nationwide to a rescission of the agreement. Nationwide's arguments are without merit.

*In the absence of a settlement agreement between Voland and Nationwide,* Voland's execution of the Release or the Stipulation, or both, may have constituted a breach of Nationwide's insurance policy to the extent Voland failed to protect Nationwide's rights. *See Cleaveland v. C & P Telephone Co.,* 225 Md. 47, 51–52, 169 A.2d 446 (1961) (settlement with tortfeasor, without insurer's consent, prior to payment on claim destroys insurer's right of subrogation). If so, Voland's breach would have provided Nationwide with a meritorious defense to Voland's contract claim. *See, e.g., Glenn L. Martin Co. v. Fidelity–Baltimore Nat'l Bank & Trust Co.,* 218 Md. 28, 37, 145 A.2d 267 (1958) (when one party has breached, other party may rely on that breach as defense); *see also, Hubler Rentals, Inc. v. Roadway Express, Inc.,* 637 F.2d 257, 260 (4th Cir.1981) (in the right circumstances, a court may, under

---

6. We recognize that an agreement not to pursue a claim known to be meritless is not valid consideration for a settlement agreement. *Fiege v. Boehm,* 210 Md. 352, 360, 123 A.2d 316 (1955). Nationwide, however, has never contended that Voland ever thought that his suit was meritless, or that he otherwise pursued it in bad faith.

Maryland law, refuse to allow recovery by either party when both have breached).

We need not resolve that thorny issue, however, because Nationwide and Voland *did* settle. We are unaware of any authority—and Nationwide has not presented any—that stands for the proposition that, in the absence of fraud, a party's post-settlement discovery of a meritorious claim or defense, such as a pre-settlement breach, excuses that party's performance under a settlement agreement. The law is, in fact, to the contrary. *See Fiege v. Boehm,* 210 Md. at 361, 123 A.2d 316.

The parties do not dispute that the settlement agreement constitutes a facially valid agreement, complete with offer, acceptance, and consideration.[7] When parties settle a case, they give up any meritorious claims or defenses they may have had in order to avoid further litigation. *See, e.g., Fiege,* 210 Md. at 360–63, 123 A.2d 316; *Eastern Environmental v. Industrial Park,* 45 Md.App. 512, 520, 413 A.2d 1355 (1980).

When a contractual promise is aleatory in character, the performance being expressly made conditional upon an uncertain and hazardous event, the promisee bets that it will happen and the promisor that it will not. The consideration exchanged for such a promise varies in proportion to their opinions as to probability. They consciously assume the risk. If the event occurs, ... [the promisor] is a loser; if it fails to occur, ... it is [the promisee] who is loser. *The opinion of one of them as to probability is thus shown to have been erroneous; but his mistake is not ground for rescission, because he consciously assumed the risk.* An insurer can not escape payment of the amount promised

---

7. In its brief, Nationwide states that the parties "discussed" a settlement on July 13, 1993. We note that Nationwide does not raise as an issue whether as a matter of fact the parties ever reached an actual agreement to settle. To the contrary, Nationwide's argument before the trial court, as well as its statement of issues in its brief, accepts that the parties reached a settlement agreement.

because the insured was most unexpectedly struck by lightning two days after execution of the policy. An insured can not get restitution of his insurance premiums because he has paid them for forty years and has never had a fire.... The same result obtains in any case where the risk of the existence of some factor ... is consciously considered in agreeing upon terms. There is no mistake; instead, there is awareness of the uncertainty, a conscious ignorance of the future. *This is why an ordinary compromise of a doubtful or disputed claim is not subject to rescission when one of the parties turns out to have been correct in his assertions and the other incorrect. They were aware of the uncertainty, estimated their chances, and fixed the compensation accordingly.*

3 *Corbin on Contracts* § 598, at 584–86 (1960) (footnotes omitted). *See also Id.,* § 605, at 638–41 (the ultimate value of the object of a contract involves a measure of uncertainty, and all parties to a contract assume the risk as to value; accordingly, a mistake as to value is not grounds for rescission).

 We note that "[t]he law in this State is clear that, absent intentional, culpable conduct, such as fraud, duress or undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract."[8] *Creamer v. Helferstay,* 294 Md. at 121, 448 A.2d 332 (citing, *inter alia, Wood v. Patterson,* 4 Md.Ch. 335 (1850), in which this "general rule was applied with respect to a settlement agreement."); *see also, Gatz v. Southwest Bank of Omaha,* 836 F.2d 1089, 1095 (8th Cir.1988); 13 *Williston on Contracts* § 1588, at 566 (1970)

---

8. For the purposes of contract law, the *Restatement (2d) Contracts* § 151, at 383 (1977) defines "mistake" as "a belief that is not in accord with the facts," and, depending on the circumstances, it can have legal consequences under §§ 153–55. *Williston on Contracts* defines a "mistake" as " 'an unintentional act or omission arising from ignorance, surprise, imposition or misplaced confidence, and it exists when a person under some erroneous conviction of law or fact does or omits to do some act which, but for the erroneous conviction, he would not have done or omitted.' " 13 *Williston on Contracts* § 1535, at 8 (1970) (citation omitted). *See also,* 17 C.J.S. *Contracts,* § 134, at 866 (similar definition).

("Rescission for mistake of law is ... commonly denied where the basis of the bargain was the settlement of a disputed claim."); 6 *Corbin on Contracts* § 1292, at 177–80 (1962) (accord and satisfaction not vitiated by mistake); 17 C.J.S. *Contracts,* § 143, at 888–889 (1963) ("A mistake of only one of the parties to a contract ... as to the subject matter does not affect its binding force, and ordinarily affords no ground for its avoidance....").[9]

■ Although a mistake induced by misrepresentation or fraud may justify rescission, Nationwide does not contend that either Voland or his attorney was deliberately deceptive, actively concealed facts or information, or otherwise made any false statements. Nor is there any indication in the record that either Voland or his attorney was even aware of Nationwide's interpretation of its Exclusion and Trust Agreement clauses. Under the circumstances here, the insured's failure to disclose or volunteer information does not constitute misrepresentation or fraud. *Cf. Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232, 234–40, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 *reh. denied,* 471 U.S. 1049, 105 S.Ct. 2043, 85 L.Ed.2d 341 (1985) (in an action for fraud, patent licensee's claim that licensor failed to disclose "material" information does not constitute either misrepresentation or fraud, as there was no duty to disclose the information during arms'

---

**9.** Rescission of a contract is warranted due to unilateral mistake only when the court finds as follows:

1, the mistake must be of such grave consequences that to enforce the contract as made or offered would be unconscionable; 2, the mistake must relate to a material feature of the contract; 3, the mistake must not have come about because of the violation of a positive legal duty or from culpable negligence; 4, the other party must be put *in statu quo* to the extent that he suffers no serious prejudice except the loss of his bargain.

*Baltimore v. DeLuca–Davis Constr. Co., Inc.,* 210 Md. 518, 527, 124 A.2d 557 (1955). Additionally, the mistake must be "clerical, mechanical or technical [in] nature." *Creamer,* 294 Md. at 131, 448 A.2d 332 (analyzing *DeLuca–Davis* in the context of settlement agreements).

length negotiation). In the absence of fraud or misrepresentation, Nationwide remains bound by its agreement to settle.

Williston states:

> It has been said that "there is no legal obligation on the vendor to inform the purchaser that he is under a mistake, not induced by the act of the vendor."
>
> And it is undoubtedly the general rule ... that it is not necessarily fraudulent for one party to a bargain consciously to take advantage of the ignorance or mistake of the other party, provided no words or acts of the former contribute to the mistake, and there is no duty of disclosure arising from a special or fiduciary relation of the parties based on trust or confidence.

12 *Williston on Contracts* § 1497, at 377–79 (footnotes omitted). *See also,* 17 C.J.S. *Contracts,* § 155, at 912 (1963); 17A Am.Jur.2d *Contracts* § 220, at 226 (1994). We see no reason to depart from this rule.

It is also significant that, before Nationwide offered the $5,000 settlement, nothing prevented Nationwide from checking the court file or from asking either Voland's attorney, Franklin's attorney, or Franklin's insurance carrier about the status of the case between Voland and Franklin. Moreover, Nationwide never sought to condition its settlement on verification of the status of its subrogation rights. Indeed, it did not pose even a single question to Voland's attorney about the underlying tort litigation, of which Nationwide had actual knowledge.[10] Nationwide conceded as much below.

> Every party to a contract must put forth some effort to ascertain the nature of the engagement he is confecting; and a party who seeks to avoid the contract ... is under the

---

**10.** Even if Nationwide had no duty specifically to advise counsel for its insured of particular policy provisions, it is nonetheless noteworthy that, during the settlement discussions, Nationwide never referred to the policy provisions on which it now relies. Nor did Nationwide request or instruct Voland's attorney not to negotiate a settlement without Nationwide's consent.

duty to make such efforts to discover the [truth] as would amount to ordinary diligence in law.

. . . . .

Where the means of knowledge of the truth ... are at the victim's hand, he will be presumed to have had such knowledge, and the court will not generally relieve him....

17 C.J.S. *Contracts* § 163, at 925–26 (footnotes omitted). *See also Finch,* 57 Md.App. at 238, 469 A.2d 867 (even if licensor were aware of licensee's ignorance as to a particular "material" fact, nondisclosure is not actionable because fact was a matter of public record and licensee never asked licensor about it).

Considering that, throughout the settlement negotiations, Voland and Nationwide were adversaries in litigation, we cannot say that Voland's duty to disclose was any greater than Nationwide's duty to inquire. Nationwide cannot blame Voland for its own failure to inquire, investigate, or avail itself of discovery. Nationwide never made any effort to protect its interests, and has not otherwise demonstrated that its ignorance should justify rescission.

■ Public policy considerations also support the enforceability of the settlement agreement at issue here. "[C]ourts should 'look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony.'" *Clark v. Elza,* 286 Md. 208, 219, 406 A.2d 922 (1979) (quoting *Chertkof v. Harry C. Weiskittel Co.,* 251 Md. 544, 550, 248 A.2d 373 (1968), *cert. denied,* 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969)). The policy of encouraging settlement is so important that, even when the parties later discover that the settlement may have been based on a mistake, settlement agreements will not be disturbed. *See Chernick v. Chernick,* 327 Md. 470, 481–83, 610 A.2d 770 (1992) (for policy reasons, a party should not be able to renege on divorce consent judgment, in that the judgment reflects an agreement reached between the parties); *Fiege v. Boehm,* 210 Md. at 361, 123 A.2d 316 (based on strength of policy encouraging settlements,

settlement agreement in a bastardy case may not be rescinded even after blood tests, performed after settlement, indicate that the putative father could not have been the child's actual father). *Cf. Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994) (policy of finality of litigation is so potent that even when mother admits committing perjury as to father's identity, court cannot alter paternity judgment, after 90–day modification period, on the grounds of fraud or mistake).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**