724 A.2d 88

Joyce E. GILL, et al.

v.

Jeanne RIPLEY, et al.

No. 36, Sept. Term, 1998.

Court of Appeals of Maryland.

Feb. 16, 1999.

E. Pamela Waldron, Bel Air, for appellants.

Lawrence P. Fletcher-Hill, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Margaret Witherup Tindall, Staff Attorney, all on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

The issue in this appeal is whether prosecutors and their support staff enjoy absolute immunity from civil liability for conduct committed in the prosecution of a paternity action under Maryland Code, title 5, subtitle 10 of the Family Law Article. After filing such an action, the appellee prosecutors dismissed it, with prejudice, over the objection of the child's mother. The mother, appellant Joyce Gill, later sued the prosecutors and a clerical employee, alleging a variety of common law torts arising from the dismissal of the paternity action. Concluding that the prosecutors and the clerical employee were endowed with absolute immunity, the Circuit Court for Harford County dismissed the complaint. We shall affirm that judgment.

## BACKGROUND

This action was filed by appellant, individually and as guardian and next friend of her daughter, Jessica. The defendants/appellees are (1) Joseph Cassilly, the State's Attorney for Harford County, (2) Jeanne Ripley, formerly an Assistant

State's Attorney for that county, (3) Beverly Green, a child support enforcement employee working in or for the State's Attorney's Office, (4) the office of the State's Attorney for Harford County, (5) Harford County, and (6) the State of Maryland.

Because this case comes to us from the dismissal, on the pleading, of appellant's complaint, we must take as fact the well-pleaded allegations in that complaint, along with the reasonable inferences that may properly be drawn from those allegations. *Warner v. Lerner*, 348 Md. 733, 735, 705 A.2d 1169,1170 (1998); *Flaherty v. Weinberg*, 303 Md. 116, 135, 492 A.2d 618, 628 (1985). This action stems from an earlier one that reached this Court, however, and much of the background of the current dispute was set forth in the opinion filed in that case, *Jessica G. v. Hector M.*, 337 Md. 388, 653 A.2d 922, *cert. denied*, 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995). The recitations are not identical, but neither are they materially inconsistent, so we shall draw from both.

In March, 1985, Joyce Gill had an intimate relationship with Hector Montesdeoca. On December 31, 1985, she gave birth to Jessica. In May, 1986, pursuant to §§ 5–1011 and 10–115 of the Family Law Article, Mr. Cassilly and Ms. Ripley filed a paternity action on behalf of Joyce against Hector in the Circuit Court for Harford County.[1] Although blood tests indicated a 99.97% probability that Hector was Jessica's father, Hector vigorously contested the action and, for two years, engaged in extensive discovery. Joyce contends in her complaint that "the defendants, and their respective offices, supervisors and staff, became annoyed at the level of effort

---

1. Those sections, which, at the times relevant to this case, contained similar language, authorized the State's Attorney to represent the Child Support Enforcement Administration or a person approved by the Administration for child support services in a paternity action. We shall assume that Joyce was such a person and that the prosecutors were therefore representing her. *See Jessica G. v. Hector M., supra,* 337 Md. at 392, 653 A.2d at 924–25.

   Because both Joyce and Jessica have the same last name, we shall refer to them by their first names, for purposes of clarity. A reference to Ms. Gill might be confusing.

they had to expend to prosecute the paternity case," that they also became annoyed when Joyce called about her case, that they avoided her calls and visits "because they were forced to contend with a troublesome case, a troublesome opposing counsel, and a frustrated client who was angry after years of litigation and no order of paternity or support," and that, after two years of litigation and no foreseeable trial date, Ms. Ripley dismissed Joyce's paternity action with prejudice.[2]

The order of dismissal, apparently framed as a consent order, was signed by Hector, Hector's attorney, Ms. Ripley, and a judge of the circuit court. Joyce, who objected to the dismissal "with prejudice" and communicated that objection to Ms. Ripley, refused to sign the order. Notwithstanding that objection, Ms. Ripley filed the order on March 1, 1988, thereby terminating the action. Promptly and over the next three years, Joyce returned to the State's Attorney's office on numerous occasions to ask that the case be reopened, but she was consistently turned away and was not allowed to speak to Ms. Ripley or any other attorney in the office. Finally, Ms. Green, who was not an attorney, informed her that, because of the dismissal, she was forever precluded from bringing a paternity action or support proceeding against Hector. In 1992, a Uniform Reciprocal Enforcement of Support Act (URESA) action was filed in New York, but in June of that year the New York court, applying *res judicata,* dismissed the action with prejudice, based on the dismissal of the Harford County action. Joyce then moved the Circuit Court for Harford County to vacate the 1988 dismissal; that motion was

---

**2.** As indicated, we must assume the truth of those statements. We note, however, that, in her brief in this case, Joyce states that "[t]ired and disillusioned, [she] asked to stop the proceeding." That is consistent with the evidence presented in the earlier proceeding. In reciting the relevant facts in *Jessica G. v. Hector M., supra,* we stated that, for two years Hector conducted extensive discovery, which included interrogatories, depositions, and requests for production of documents, and "[a]t that point in the proceedings, *Joyce asked to stop the paternity suit." Id.* at 392, 653 A.2d at 924 (emphasis added). It is evident from this that Joyce's complaint is not that the defendants dismissed the action without her consent, but that they did so with prejudice.

denied upon a finding that there had been no fraud, mistake, or irregularity in the entry of the judgment and therefore there was no basis for reopening it. Joyce's *pro se* appeal to the Court of Special Appeals was dismissed for failure to file a brief.

In December, 1992, Jessica filed a paternity action against Hector in the Harford County court. That action also was dismissed on the ground of *res judicata*, but on appeal, we reversed. In presenting her argument, Jessica urged that *res judicata* should not be applied because of the "procedural and equitable defects" in the dismissal of the original action, namely, the fact that Ms. Ripley docketed the consent order of dismissal without Joyce's signature and over her objection. She contended that that action "went beyond the scope of the attorney's authority," in that "an attorney has no implied authority to compromise a client's claim." *Jessica G., supra,* 337 Md. at 395, 653 A.2d at 926. We did not rule directly on that contention, although it played a part in our decision. Our ruling was based on § 5–1038(b) of the Family Law Article, which, except for "a declaration of paternity," expressly allows a court to modify or set aside a paternity order "as the court considers just and proper in light of the circumstances and in the best interests of the child." We concluded that "[t]he action of the State's Attorney in dismissing the paternity action with prejudice over the objection of the child's indigent mother in spite of a 99.97% probability of paternity was certainly contrary to the best interests of the child." *Id.* at 402, 653 A.2d at 929.

The record now before us does not reveal what has transpired with respect to Jessica's claim since our ruling in February, 1995—whether a support order has been entered against Hector. In this tort action, filed in November, 1995, Joyce and Jessica are seeking substantial compensatory and punitive damages as a result of the dismissal of the initial proceeding. They contend that the dismissal without Joyce's consent was motivated by the defendants' ill will and malice and was intended to harm and punish Joyce and Jessica. They aver that Cassilly, Ripley, and Green fraudulently con-

cealed their wrongful behavior by representing that the dismissal was Joyce's fault and by refusing to allow Joyce to see an attorney to discuss her case. On those allegations, Joyce and/or Jessica sued Ripley and Green for negligence, gross negligence, fraud, detrimental reliance, and intentional infliction of emotional distress. Ripley, in addition, was sued for professional malpractice. Cassilly was sued for professional malpractice, detrimental reliance, intentional infliction of emotional distress, and gross negligence, and Harford County and the State were sued, vicariously, as the alleged employers of Ripley and Green. These were all common law actions; no claim was made under 42 U.S.C. § 1983, or under the Maryland Constitution.

Ripley, Green, and Cassilly moved to dismiss the complaint on a number of grounds but principally relied on the defense of absolute prosecutorial immunity. The State adopted the individual defenses and argued as well the failure to file a timely claim with the Treasurer, as required by the State Tort Claims Act, Maryland Code, § 12–106 of the State Government Article. Harford County denied that Ripley and Green were its employees.

In a well-reasoned memorandum opinion, Judge Carr granted the motions to dismiss. He concluded that the individual defendants were, indeed, clothed with absolute prosecutorial immunity with respect to the challenged conduct, that the plaintiffs had failed to give timely notice to the Treasurer, thereby dooming their action against the State, and that Ripley and Green were not county employees. The only issue raised in this appeal is that of the individual defendants' prosecutorial immunity. Appellants do not challenge Judge Carr's rulings with respect to the State and Harford County.

## DISCUSSION

### Prosecutorial Immunity In General

The question of whether a prosecutor enjoys absolute immunity from civil liability was raised in *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981). We observed then that we had

never considered the extent to which a prosecutor may be entitled to such immunity outside of a judicial proceeding, and we found it unnecessary to do so in that case. We deal with the issue now.

Although prosecutorial immunity has been recognized for over a century in the United States, it is a relative latecomer.[3] It arose initially as an adjunct to the doctrine of judicial immunity but has been clothed as well with the mantle of executive official immunity; indeed, it is the distinction between those two forms of immunity that has marked much of the development of prosecutorial immunity.

Judicial immunity has the more ancient lineage. As Judge Eldridge pointed out in *Parker v. State,* 337 Md. 271, 277, 653 A.2d 436, 439 (1995), "[t]he principle that judicial officers should be immune from all civil liability for their judicial acts has been part of the common law since very early days." It was "firmly established" in England by the seventeenth and eighteenth centuries and began to be recognized by American courts in the early years of the nineteenth century. *Id.* at 279–80, 653 A.2d at 440. The public policy basis of the doctrine was enunciated by the Supreme Court in *Bradley v. Fisher,* 13 Wall. 335, 347, 80 U.S. 335, 347, 20 L.Ed. 646, 649 (1871):

"[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge,

---

3. Unless quoting from another source, we shall use the term "immunity" in this Opinion. Some courts, especially in cases charging defamation, have used the term "privilege" rather than "immunity." We think that "immunity" is the more descriptive term in this context. What really is at issue is whether prosecutors may be held civilly liable for damages for conduct that is allegedly wrongful—conduct which, if committed by someone else, would subject the person to such liability. It is not really a "privilege" to commit the wrongful conduct that the law recognizes, but rather an exemption from civil liability founded upon broader principles of public policy.

would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful." [4]

We concurred with that view in *Parker*, pointing out that, with the important issues at stake in an adversarial context, "absolute immunity is needed to forestall endless collateral attacks on judgments through civil actions against the judges themselves." *Parker v. State, supra,* 337 Md. at 287, 653 A.2d at 443. The immunity given to judges is not entirely unlimited, but, as confirmed in *Mireles v. Waco,* 502 U.S. 9, 11–12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991), it may be overcome "in only two sets of circumstances"—when the conduct is nonjudicial, "*i.e.,* actions not taken in the judge's judicial capacity," and when the conduct "though judicial in nature, [is] taken in the complete absence of all jurisdiction." *See also Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993); *Mandel v. O'Hara,* 320 Md. 103, 576 A.2d 766 (1990); *Parker v. State, supra,* 337 Md. 271, 653 A.2d 436.

The doctrine of judicial immunity, first applied with respect to judges, eventually was expanded to include others involved with the judicial process—to justices of the peace, to military officials exercising authority to order courts-martial, to grand and petit jurors, and to witnesses, parties, and attorneys, at least with respect to defamatory statements "uttered in the

---

4. A somewhat different rationale for judicial immunity was given in an early English case, tried in the Star Chamber. In *Floyd v. Barker,* 12 Coke 23, 77 E. R.1305, 1307 (1608), it is written:

"And the reason and cause why a Judge, for any thing done by him as Judge, by the authority which the King hath committed to him, and as sitting in the seat of the King (concerning his justice) shall not be drawn in question before any other Judge, for any surmise of corruption, except before the King himself, is for this: the King himself is *de jure* to deliver justice to all his subjects; and for this, that he himself cannot do it to all persons, he delegates his power to his Judges, who have the custody and guard of the King's oath.

And forasmuch as this concerns the honour and conscience of the King, there is great reason that the King himself shall take account of it, and no other."

course of a trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case." *Di Blasio v. Kolodner,* 233 Md. 512, 522, 197 A.2d 245, 250 (1964). *See Yaselli v. Goff,* 12 F.2d 396 (2d Cir.1926), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927); *Munster v. Lamb,* 11 Q.B.D. 588 (1883); *Hayslip v. Wellford,* 195 Tenn. 621, 263 S.W.2d 136, *cert. denied,* 346 U.S. 911, 74 S.Ct. 243, 98 L.Ed. 408 (1953); *Griffith v. Slinkard,* 146 Ind. 117, 44 N.E. 1001 (1896); *Engelke v. Chouteau,* 98 Mo. 629, 12 S.W. 358 (1889); *Turpen v. Booth,* 56 Cal. 65 (1880); *Hunter v. Mathis,* 40 Ind. 356 (1872); T. COOLEY, LAW OF TORTS 408–09 (1880).

We have expressly recognized a limited, but absolute privilege for witnesses, *Hunckel v. Voneiff,* 69 Md. 179, 14 A. 500 (1888); *Rosenberg v. Helinski,* 328 Md. 664, 676, 616 A.2d 866, 872 (1992), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993), for parties to litigation, *Bartlett v. Christhilf,* 69 Md. 219, 14 A. 518 (1888), and for attorneys, at least as to communications with the client, the examination of witnesses, statements made to the court or jury, and statements made in pleadings, *Maulsby v. Reifsnider,* 69 Md. 143, 14 A. 505 (1888); *Di Blasio v. Kolodner, supra,* 233 Md. 512, 197 A.2d 245; *Kennedy v. Cannon,* 229 Md. 92, 182 A.2d 54 (1962).

These extensions all rest on principles of imperative public policy. Judicial immunity was extended to *officials* other than judges "because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function." *Antoine v. Byers & Anderson, supra,* 508 U.S. at 436, 113 S.Ct. at 2171, 124 L.Ed.2d at 399, quoting from *Imbler v. Pachtman,* 424 U.S. 409, 423, 96 S.Ct. 984, 991, 47 L.Ed.2d 128, 139 n. 20 (1976). The public policy notions articulated in *Bradley v. Fisher* with regard to judges thus justified an immunity for the judicial acts or omissions of those officials as well. The extension to witnesses, attorneys, and parties also was regarded by us as necessary to the proper administration of justice. Subject, of course, to prosecution for perjury, witnesses, who testify under compulsion, must be free to testify according to their belief of the truth, free from apprehension of civil

liability for what they may say. *Hunckel v. Voneiff, supra*, 69 Md. at 187, 14 A. at 501. Attorneys, obliged in the discharge of a professional duty to prosecute and defend the most important rights and interests of their clients "should be allowed the widest latitude in commenting on the character, the conduct and motives of parties and witnesses and other persons directly or remotely connected with the subject-matter in litigation." *Maulsby v. Reifsnider, supra*, 69 Md. at 151, 14 A. at 505.

A second form of immunity, protecting legislators and civil and military officers, also originated in English law. An absolute immunity for legislators, with respect to conduct and statements made in the course of legislative proceedings, is as venerable as judicial immunity, having been traced back to 1399. *Barr v. Matteo*, 360 U.S. 564, 579, 79 S.Ct. 1335, 1343, 3 L.Ed.2d 1434, 1446 (1959) (Warren, C.J., dissenting). It has been recognized both through Speech and Debate Clauses in the Federal and State Constitutions and, more anciently, as a matter of common law. *See Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, *reh. denied*, 342 U.S. 843, 72 S.Ct. 20, 96 L.Ed. 637 (1951); *Mandel v. O'Hara*, 320 Md. 103, 576 A.2d 766 (1990); *Montgomery County v. Schooley*, 97 Md.App. 107, 627 A.2d 69 (1993). Immunity for executive officials arose later and has been modified over time. Initially, it too was cast as absolute in nature, at least with respect to claims of defamation. *See Dawkins v. Paulet*, L.R.5 Q.B. 94 (1869); *Dawkins v. Rokeby*, L.R. 8 Q.B. 255 (1873), *aff'd*, L.R. 7 H.L. 744; *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). That view has since been clarified and modified, however, both by the Supreme Court and by this Court. *See Butz v. Economou*, 438 U.S. 478, 493–94, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Mandel v. O'Hara, supra*, 320 Md. 103, 576 A.2d 766. As a general rule, Federal, State, and local executive officials, when exercising executive functions, currently enjoy either a qualified immunity of one kind or another or no immunity at all. *Butz, supra; Parker v. State, supra*, 337 Md. 271, 653 A.2d 436. Depending to some extent on the nature of the claim, they may be subject to civil liability

for common law torts if they exceed their lawful authority or, in some instances, if they commit an intentional tort or act with malice, and they remain subject to liability under 42 U.S.C. § 1983 if their conduct violates "clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982).

Because the office of public prosecutor was largely unknown in England, we did not inherit any separate doctrine of prosecutorial immunity from English common law. That doctrine developed largely in the American courts, *Burns v. Reed,* 500 U.S. 478, 493, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), mostly in the context of malicious prosecution, false arrest, and defamation claims. The case generally thought to be the progenitor of the doctrine was *Griffith v. Slinkard,* 146 Ind. 117, 44 N.E. 1001 (Ind.1896). A prosecutor was charged with malicious prosecution and defamation based on his insertion of the plaintiff's name, as a co-defendant, in an indictment, after the grand jury had concluded that there was insufficient evidence against the plaintiff and voted not to indict him. As a result of the wrongful indictment, the plaintiff was arrested, detained, and put to some expense. The Indiana court regarded the prosecutor as a "judicial officer," exercising duties of a judicial nature. It therefore applied the rule that "[n]o public officer is responsible in a civil suit for a judicial determination, however erroneous it may be, and however malicious the motive which produced it," and concluded that there was "no more liability against the prosecuting attorney than there is against the grand jury for the return of an indictment maliciously and without probable cause." *Id.* at 1002.

That view was rejected in *Leong Yau v. Carden,* 23 Haw. 362 (1916). The defendant prosecutor was charged with having procured the plaintiff's arrest by signing and presenting to a judge a false and malicious affidavit, upon which the judge issued a warrant. In sustaining exceptions to the defendant's demurrer, the court characterized public prosecutors as executive, rather than judicial, officials, although it acknowledged

that, as with other executive officials, they sometimes perform quasi-judicial duties. It accorded them a qualified, but not an absolute, immunity, concluding that "[p]ublic prosecuting officers are entitled to protection against claims growing out of the discharge of their duties done in good faith though with erroneous judgment, but private individuals are entitled to the protection of the law against any conduct of such officers which is at once reckless, malicious and damaging." *Id.* at 369. Thus, it held that, although a prosecutor is not liable in damages for "an honest mistake or error in judgment," he is liable "if he prosecutes without probable cause and with malice...." *Id.*

In *Smith v. Parman*, 101 Kan. 115, 165 P. 663 (Kan.1917), another malicious prosecution case, the Kansas court also questioned whether the prosecutor really was a "judicial officer," but it concluded that, in determining which prosecutions to bring, "he acts at least in a quasi judicial capacity." *Id.* at 663. Noting the immunity that protected judges and grand jurors, the court found that, in deciding whether a particular prosecution should be instituted or pursued, prosecutors perform much the same function as the grand jury, and that the same public policy basis for the immunity enjoyed by judges and grand jurors applied as well to prosecutors. It expressed concern that if, in deciding whether to proceed, the prosecutor "is charged with notice that he may have to defend an action for malicious prosecution in case of a failure to convict, his course may be influenced by that consideration, to the disadvantage of the public." *Id.* Immunity from civil liability, the court concluded, was not likely to foster an abuse of power, as the prosecutor could be called to account criminally or removed from office for official misconduct.

Succeeding cases found the views of the Indiana and Kansas courts more persuasive than those of Hawaii, and absolute immunity became the prevailing common law doctrine. *See Semmes v. Collins*, 120 Miss. 265, 82 So. 145 (Miss.1919); *Watts v. Gerking*, 111 Or. 641, 228 P. 135 (Or.1924); *Yaselli v. Goff, supra*, 12 F.2d 396; *Kittler v. Kelsch*, 56 N.D. 227, 216 N.W. 898 (N.D.1927); *Pearson v. Reed*, 6 Cal.App.2d 277, 44

P.2d 592 (Cal.App.1935). *See also Imbler v. Pachtman, supra,* 424 U.S. 409, 422, 96 S.Ct. at 991,47 L.Ed.2d at 138, noting that "[t]he *Griffith* view on prosecutorial immunity became the clear majority rule on the issue."

The Supreme Court first addressed the issue, albeit cursorily, in an appeal from the decision of the Second Circuit Court of Appeals in *Yaselli v. Goff, supra,* 12 F.2d 396. In an exhaustive opinion, the court of appeals determined that prosecutors required the same freedom and discretion to carry out their quasi-judicial duties as judges and grand jurors and, on that basis, extended absolute prosecutorial immunity to a special assistant attorney general appointed by the Attorney General of the United States to investigate and prosecute a particular case. In a *per curiam* memorandum decision, the Supreme Court affirmed "on the authority of *Bradley v. Fisher,* 13 Wall. 335, 347, 20 L.Ed. 646; *Alzua v. Johnson,* 231 U.S. 106, 111, 34 S.Ct. 27, 58 L.Ed. 142." *Yaselli v. Goff,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). The citation to *Bradley* and to *Alzua,* in which the Court applied the absolute judicial immunity established in *Bradley* to a judge of the Supreme Court of the Philippine Islands, indicates a conclusion that prosecutors were entitled to the same immunity possessed by judges.

The question of prosecutorial immunity came before the Court again, in the context of an action under 42 U.S.C. § 1983, in *Imbler v. Pachtman, supra,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128. The plaintiff, who had been prosecuted by the defendant, convicted, sentenced to death, and later released on Federal habeas corpus, averred that the prosecutor had, in effect, suborned perjury and suppressed favorable evidence. The Supreme Court began its analysis by drawing from *Tenney v. Brandhove, supra,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019—the case establishing absolute immunity for legislators as to claims under § 1983—the principle that § 1983 was to be read "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Id.* at 418, 96 S.Ct. at 989, 47 L.Ed.2d at 136.

After determining that, at common law, prosecutors enjoyed an absolute immunity from civil liability with respect to their prosecutorial conduct, the Court observed that "[t]he common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties," including "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 422–23, 96 S.Ct. at 991, 47 L.Ed.2d at 139. Those same concerns, the Court held, applied as well to liability under § 1983. Focusing on the kinds of suits most often brought against prosecutors—malicious prosecution actions by erstwhile defendants—the Court concluded that, if prosecutors had only a qualified immunity, the threat of § 1983 suits "would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution." *Id.* at 424, 96 S.Ct. at 992, 47 L.Ed.2d at 140. Independence of judgment was required both in deciding which cases to prosecute and in the manner of prosecution. In balancing those considerations against the effect of absolute immunity on persons truly wronged by prosecutorial misconduct, the Court noted that the public would not be entirely without remedy—that prosecutors were not only subject to professional discipline as lawyers but may be subject to criminal prosecution under 18 U.S.C. § 242 for wilful deprivations of Constitutional rights. In defining the contour of its decision, the Court approved the functional approach taken by the Ninth Circuit Court of Appeals in the case, applying absolute immunity to conduct "associated with the judicial process." *Id.* at 430, 96 S.Ct. at 995, 47 L.Ed.2d at 143. The Court left open whether that immunity would apply as well to investigative and administrative functions performed by prosecutors.

The Supreme Court addressed the open question and clarified and applied the functional approach in two subsequent cases—*Burns v. Reed, supra,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), and *Buckley v. Fitzsimmons,* 509 U.S.

259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In *Burns*, the prosecutor was sued under § 1983 for having (1) advised investigating police officers that it was permissible to interview the plaintiff, a suspect in a multiple shooting, under hypnosis, (2) advised the police that, in light of statements made by the plaintiff while under hypnosis, probable cause existed to arrest the plaintiff, and (3) appeared at a probable cause hearing seeking a search warrant and failed to inform the judge that the plaintiff's "confession" was obtained while she was under hypnosis. A warrant was obtained and charges were brought against the plaintiff, but they were dismissed after the court suppressed the hypnotically-induced statements. Borrowing heavily from *Imbler*, the Court noted that it had applied absolute immunity from liability under § 1983 for conduct in "initiating a prosecution and in presenting the State's case," insofar as that conduct is "intimately associated with the judicial phase of the criminal process" but had reserved with respect to investigative and administrative conduct. *Burns, supra*, 500 U.S. at 486, 111 S.Ct. at 1935, 114 L.Ed.2d at 558. It observed as well that, ordinarily, qualified immunity is sufficient to protect government officials in the exercise of their duties and that officials seeking absolute immunity had the burden of showing that absolute immunity "is justified for the function in question." *Id.*

Parsing out the conduct at issue, the Court held that the defendant was absolutely immune with respect to his participation as a lawyer at the probable cause hearing. It applied the common law immunity applicable to witnesses and lawyers for statements made in and related to judicial proceedings, including the elicitation of false and defamatory testimony. A different conclusion was reached with respect to the advice given to the police, however. The Court noted that there was no historical or common law support for extending absolute immunity to that kind of conduct, and it determined that advising the police in the investigative phase of a criminal case was not so intimately involved with the judicial phase of the criminal process to justify an absolute immunity:

"Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation [citation omitted]. That concern therefore justifies absolute prosecutorial immunity only for actions that are concerned with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct."

*Id.* at 494, 111 S.Ct. at 1943, 114 L.Ed.2d at 563–64 (emphasis in original).

In *Buckley v. Fitzsimmons*, prosecutors were charged under § 1983 with having fabricated false evidence used to indict the plaintiff and for having made false and defamatory statements concerning the plaintiff at a press conference announcing his arrest. In analyzing the fabrication claim, the Court rejected the plaintiff's view that absolute immunity does not apply until the criminal case is actually filed, confirming instead that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." 509 U.S. at 273, 113 S.Ct. at 2615, 125 L.Ed.2d at 226. It also confirmed, however, that qualified immunity was the norm and that, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer," the lesser immunity available to those officials would also apply to the prosecutor. Upon the facts alleged in the complaint, it was clear that the prosecutors' mission at the time they fabricated the false evidence was entirely investigative in character, there being no probable cause then to arrest anyone. Only qualified immunity applied.

The prosecutors fared no better with respect to their press conference statements. The conduct of a press conference, the Court held, may be an integral part of a prosecutor's job and may serve a vital public function, but it "does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions," and "in these respects a prosecutor is in no different position than other executive officials who deal with the press...." *Id.* at 278, 113 S.Ct. at 2618, 125 L.Ed.2d at 229.

■ Although, as noted, we have not dealt specifically with prosecutorial immunity, we have, in defining and applying judicial immunity, from which prosecutorial immunity arose and with which it maintains some affinity, adopted the functional approach taken by the Supreme Court, holding that absolute immunity protects judges "so long as their acts are 'judicial' . . . in nature and within the very general scope of their jurisdiction." *Parker v. State, supra,* 337 Md. at 284, 653 A.2d at 442, quoting in part from *Mandel v. O'Hara, supra,* 320 Md. at 107, 576 A.2d at 768. There is no reason to depart from that approach with respect to prosecutorial immunity. We conclude, therefore, as a matter of Maryland common law, that prosecutors enjoy absolute immunity with respect to claims arising from their role in the judicial process—evaluating whether to commence a prosecution by criminal information, presenting evidence to a grand jury in the quest for an indictment, filing charges, and preparing and presenting the State's case in court.[5]

Unquestionably, Mr. Cassilly and Ms. Ripley, as prosecutors, would be entitled to whatever immunity applies with respect to the challenged conduct, a matter we shall consider shortly. The question, not discussed at any length by either party, is whether that immunity would apply as well to Ms. Greene, a clerical employee. Her alleged misconduct was in (1) telling Joyce that she was precluded from pursuing a paternity action against Hector—in effect giving legal advice

---

5. We do not here hold that prosecutors are necessarily entitled to absolute immunity with respect to all grand jury proceedings. If the proceeding before the grand jury is predominantly investigative in nature, rather than for the purpose of seeking an indictment against particular persons, the qualified immunity applicable to investigative functions may apply. That is not an issue we need to resolve in this case.

Moreover, while allegations of malice, such as made in this case, will not defeat the immunity of prosecutors, we leave for another day the question of whether there should be any limit upon that immunity. Arguably, immunity should not apply when a prosecutor engages in extreme conduct, such as deliberately falsifying an indictment or accepting a bribe to file criminal charges. Again, this is not an issue we need to resolve in this case.

that Joyce claims was inaccurate, and (2) not allowing Joyce to speak with Ms. Ripley or other attorneys.

We have found no cases, and none have been cited, dealing with the extent to which a clerical employee in a prosecutor's office partakes of the immunity enjoyed by the prosecutor. There have, however, been a number of cases dealing with the extension of judicial immunity to law clerks employed by a judge and to court clerks who act under the direction of a judge or who implement judicial orders of one kind or another. The general rule is that those individuals, when performing tasks that are integral to the judicial process, enjoy the same immunity that is applicable to the judges. Particularly in the more recent cases, the courts have applied the same kind of functional analysis that has been applied to judges.

With respect to court clerks, some courts have accorded judicial immunity only in connection with discretionary, as opposed to ministerial, acts, *Lowe v. Letsinger,* 772 F.2d 308 (7th Cir.1985), or when the act is required by court order or taken at a judge's direction, *Williams v. Wood,* 612 F.2d 982 (5 [th] Cir.1980). *See also Tarter v. Hury,* 646 F.2d 1010, 1013 (5th Cir.1981); *Denman v. Leedy,* 479 F.2d 1097, 1098 (6th Cir.1973); *Scott v. Dixon,* 720 F.2d 1542, 1546 (11th Cir.1983), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); Andrea G. Nadel, *Applicability of Judicial Immunity to Acts of Clerk of Court under State Law,* 34 A.L.R.4th 1186 (1984). Other courts have looked more at whether the conduct was an integral part of the judicial process, rather than whether it was discretionary or ministerial in nature. *Sindram v. Suda,* 986 F.2d 1459 (D.C.Cir.1993); *Mullis v. U.S. Bankruptcy Court, Dist. of Nevada,* 828 F.2d 1385 (9th Cir.1987), *cert. denied,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988); *Foster v. Walsh,* 864 F.2d 416 (6th Cir.1988). Even under the more restrictive approach, judicial immunity has been applied to court clerks with respect to discretionary acts that implement judicial decisions or that are performed at the direction or under the supervision of a judge.

Judicial immunity has likewise been extended to law clerks employed by judges. In *Oliva v. Heller*, 839 F.2d 37 (2d Cir.1988), the plaintiff, who had been convicted of a criminal offense, filed a motion to vacate his sentence. The judge assigned the matter to the defendant, one of his law clerks. The clerk had recently accepted a position with the U.S. Attorney's office, to commence upon the completion of her clerkship, and her practice was not to work on any matter in which the U.S. Attorney appeared unless all parties consented; such matters were routinely assigned to the judge's other law clerk. In this instance, through an oversight, she neglected to obtain the plaintiff's consent and assisted the judge in his consideration of the motion. The plaintiff learned of the clerk's potential conflict after the motion was denied, whereupon he filed a motion to reconsider the denial and to recuse the judge. The judge did recuse, to avoid even an appearance of impropriety, and the motion was heard by another judge, who granted the motion to reconsider but denied relief on the merits. The plaintiff then sued the law clerk for damages for violating his Fifth and Sixth Amendment rights.

Noting both the functional approach taken by the Supreme Court with respect to judicial immunity—under which such immunity "flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official"—and the decisions applying judicial immunity to court clerks exercising discretionary acts of a judicial nature, the court concluded that the same immunity should be enjoyed by law clerks. *Id.* at 39–40, quoting in part from *Cleavinger v. Saxner*, 474 U.S. 193, 201, 106 S.Ct. 496, 501, 88 L.Ed.2d 507, 514 (1985). Their work, it held, is entirely judicial in nature and is "supervised, approved, and adopted by the judges who initially authorized it." *Id.* at 40, quoting from the District Court opinion in *Oliva v. Heller*, 670 F.Supp. 523, 526 (S.D.N.Y.1987). *See also Moore v. Brewster*, 96 F.3d 1240 (9th Cir.1996), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 848 (1997); *Mitchell v. McBryde*, 944 F.2d 229 (5th Cir.1991); *Fariello v. Campbell*, 860 F.Supp. 54 (E.D.N.Y. 1994).

■ The allegations laid against Ms. Greene, and the reasonable inferences to be drawn therefrom, are that she was an employee of the Bureau of Support Enforcement, located within the State's Attorney's office, that she informed Joyce that her case against Hector was "over and forever precluded," that, along with Ms. Ripley, she "refused to follow the express instructions of [Joyce] with regard to reopening the case and pursuing child support," that, whenever Joyce appeared at the State's Attorney's office, Ms. Greene refused to allow her to meet with an attorney in the State's Attorney's office about reopening the proceeding, and that at all relevant times, Ms. Greene was acting within the scope of her employment.

It is evident from these allegations and inferences that Ms. Greene was acting under the direction of the State's Attorney and that her conduct was directly and intimately involved with the prosecution, or non-prosecution, of Joyce's paternity action. We can find no principled basis upon which to distinguish her role from that of law clerks or court clerks who act under the control and supervision of judges and who perform functions that are integral to the judicial process. Whatever immunity inheres to the prosecutors in this case is enjoyed by her as well.

### Prosecutorial Immunity In This Case

Joyce acknowledges that prosecutorial immunity applies when a prosecutor, while representing the State in a criminal case, acts within the scope of his or her power as a prosecutor and performs a duty intimately related to the State's case. She argues against the extension of absolute immunity here on the grounds that (1) the paternity action was a civil, not a criminal case, (2) the prosecutors were representing her, not the State, (3) in dismissing the action with prejudice, they were not acting within the scope of their authority as counsel for her, and (4) their conduct, in foreclosing any future effort by her or Jessica to collect support and forcing them to seek assistance from social services, was so outrageous that immunity should not apply.

To some extent, these grounds overlap and coalesce. To the extent that they rest on the premise that appellees were acting as counsel for Joyce, rather than for the State, we note, preliminarily, that, by virtue of a 1997 statute, the Legislature has made clear that attorneys who provide representation under §§ 5–1011 and 10–115 represent only the Child Support Enforcement Administration and that no attorney-client relationship is created between that attorney "and any other person." *See* 1997 Md. Laws, ch. 646, amending § 10–115. As this case is based on facts occurring in 1988, however, we need to consider the law as it existed then. The end result is the same.

There can be little doubt from the principles discussed above that the decision to terminate a prosecution, with or without prejudice, is a quasi-judicial function and, at least in a criminal context, is therefore within the ambit of absolute prosecutorial immunity. Whether that decision is right, wrong, malicious, or non-malicious, it necessarily is part of the prosecution process and stands on the same footing as a decision whether to commence a particular prosecution, whether to charge one offense rather than another, what evidence to produce, and what arguments to make. All are part of the judicial process that serves as the essential underpinning of prosecutorial immunity. The true issue here is whether, because the paternity action filed in this case under title 5, subtitle 10 of the Family Law Article was a civil proceeding to which Joyce was a party, the prosecutors, acting pursuant to §§ 5–1011 and 10–115, were clothed with the same immunity they enjoy when prosecuting criminal cases.

State's Attorneys are provided for in the Maryland Constitution, Article V, § 7, but they have no explicit Constitutional duties. Article V, § 9 of the Constitution states that they "shall perform such duties ... as shall be prescribed by the General Assembly." Article 10, § 2 (formerly § 34) of the Code provides, generally, that the State's Attorney shall "prosecute and defend, on the part of the State, all cases in which the State may be interested," but additional, more specific duties are spread throughout the Code. Most of those

duties involve criminal prosecutions, but the State's Attorneys have been given authority in a variety of civil matters as well. They are authorized, for example, to prosecute juvenile delinquency cases, which are civil in nature (§ 3–810 of the Courts and Judicial Proceedings Article); they often represent the State in probation revocation hearings, which are also civil in nature (*Chase v. State*, 309 Md. 224, 522 A.2d 1348 (1987)); they are authorized, upon request, to assist the Attorney General in the civil enforcement of the State Anti–Trust law (§ 11–209 of the Commercial Law Article); they are authorized to prosecute civil forfeiture actions under Article 27, § 297; and, as noted, they are authorized to represent the Child Support Enforcement Administration and persons approved by that Administration for child support services in paternity actions.

Maryland's current paternity law grew out of the old bastardy and fornication laws, which came to us from England. Under statutes enacted during the reigns of Elizabeth I. and James I., the parents of a child born out of wedlock were subject to criminal penalties if the child became a public charge. *See* IV WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 65, citing 18 Eliz. c. 3, and 7 Jac I. c. 4. The principal concern, however, was then, as it is now, not in punishing the parents criminally but in assuring parental support for the child. Blackstone noted that the criminal penalty, which he assumed to be a corporal punishment, "can only be inflicted, if the bastard becomes chargeable to the parish: for otherwise the very maintenance of the child is considered as a degree of punishment." *Id.* In Book I, at 458, he describes the process for assuring parental support:

"When a woman is delivered, or declares herself with child, of a bastard, and will by oath before a justice of peace charge any person as having got her with child, the justice shall cause such person to be apprehended, and commit him till he gives security, either to maintain the child, or appear at the next quarter-sessions to dispute and try the fact."

That procedure was adopted by statute in Maryland as well, at least as early as 1781. *See* 1781 Md. Laws, ch. 13.

Although the law was amended from time to time, until 1963, the practice was for the mother to be brought before a justice of the peace and either name the father or post a bond conditioned on her supporting the child. The man named by her as the father was then apprehended on warrant and, unless he agreed to support the child and posted a bond to secure that obligation, upon the birth of the child he was tried in criminal court to determine whether he was the father. If "found guilty," the father was to give bond conditioned on his supporting the child. *See* Maryland Code (1957), article 12. Only if he refused to post the bond was he subject to criminal penalty—incarceration for up to two years. Although it was perhaps implicit from the fact that the proceedings in court were to "be had as in other criminal cases" (1912 Md. Laws, ch. 163) that the State's Attorneys prosecuted them, not until 1939 was the role of the State's Attorney articulated in the law. *See* 1939 Md. Laws, ch. 182. That role was both investigatory and prosecutorial in nature. Upon the filing of an oath by the mother, the State's Attorney was authorized to present the case to a grand jury, but the preferred route seemed to be to proceed by way of criminal information. To that end, the State's Attorney was empowered to summons witnesses to testify under oath before him and to require the production of documents, in aid of determining whether to file a criminal information. Maryland Code (1957), Article 12, §§ 5, 6, and 7; current § 5–1019 of the Family Law Article.

Notwithstanding the involvement of the State's Attorneys as prosecutors and the commencement of judicial proceedings by way of indictment or criminal information, the proceeding to determine paternity and set an order of support, even under the pre–1963 regime, embodied elements of both criminal and civil proceedings. As in Blackstone's time, the real objective was not to punish either the father or the mother—no criminal penalty being attached directly to the conception or the delivery of the child—but rather to prevent the child from becoming a public charge. In *Kennard v. State*, 177 Md. 549, 553, 10 A.2d 710, 712 (1940), we regarded a bastardy proceeding as "[t]echnically ... not a criminal proceeding but one which

nevertheless has many of the incidents and elements of such a proceeding." In *Fiege v. Boehm*, 210 Md. 352, 359, 123 A.2d 316, 321 (1956), we put a slightly different slant on it, concluding that "[p]rosecutions for bastardy are treated in Maryland as criminal proceedings, but they are actually civil in purpose." We confirmed in *Fiege* that "[w]hile the prime object of the Maryland Bastardy Act is to protect the public from the burden of maintaining illegitimate children, it is so distinctly in the interest of the mother that she becomes the beneficiary of it." *Id.*

By 1961, an anomaly was recognized—that the criminal aspects of the bastardy proceeding were, in fact, inhibiting the achievement of its predominant civil purpose. The Commission to Study Problems of Illegitimacy noted in its 1961 Report to the General Assembly:

> "To establish paternity and provide for the child's support, the state must 'beyond a reasonable doubt', prove the man's 'guilt'; and in so doing it is restricted by technicalities of the criminal law as to time limitations, situs of the act of fornication, and inadmissibility of a married woman's testimony as to any bastard born to her. Not only do many men now escape any responsibility for the maintenance of their illegitimate children, but the present law is also inadequate from the Commission's viewpoint because it neither makes provision for inquiry into the child's custody and welfare, nor provides for a determination of the mother's obligation to support."

Final Report of the Commission to Study Problems of Illegitimacy (December, 1961) at 22.

The Commission made a number of recommendations for legislative change designed to curtail the incidence of children being born out of wedlock and to better protect the rights of those children who *were* born in that circumstance.[6] One of

---

6. Throughout history, children born out of wedlock have been referred to as "illegitimate." The term "bastard" itself has been regarded as odious, not fit for use in polite conversation. Indeed, Webster gives as secondary definitions of the word, "anything of inferior quality or

those recommendations was to convert the existing bastardy law, with its criminal or quasi-criminal base, into a purely civil proceeding to determine paternity and establish custody, guardianship, and support. In 1963, the Legislature adopted many of the Commission's recommendations, including a re-writing of the bastardy law. That law was repealed in its entirety and new provisions were inserted into the article dealing with equity proceedings. The purpose of the new law was expressed in the statute itself. As now contained in Family Law Article, § 5–1002(b), it is:

"(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock."

It is telling that § 5–1002 speaks to the public interest and the welfare of the children, not to the individual rights of the mother of the child. Indeed, the only reference to the mother in § 5–1002 is with respect to assuring that she too discharges the responsibilities of parenthood. The substance of the statute was, and is, in conformance with that view. The mother of the child has never been a necessary plaintiff. Without the consent of the State's Attorney or the court, she may not file a paternity complaint on her own. § 5–1010. The only reference to the mother being a complainant is in §§ 5–1011 and 10–115, which provide that the complainant shall be represented by

varying from standard" and "a counterfeit; sham." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY at 156. At early common law, there may have been a basis for those connotations, as such children had few rights under the law and were not recognized as having a legal connection to their parents. It is simply impermissible now for courts to refer to children in that manner. Children are never "illegitimate," and certainly are not so because of their parents' circumstances.

the Attorney General, the State's Attorney, or a qualified lawyer "representing the Administration" appointed by the Attorney General if the complainant either is the Administration "or a person approved for child support services by the Administration."[7] Once a complaint has been filed, the proceeding may not be dismissed voluntarily except by order of court for good cause or with the consent of the State's Attorney. The mother's consent is not required; nor may she dismiss the complaint on her own. On the other hand, a settlement may not be effected unless "the complainant," if competent, agrees to accept it. § 5–1016(b).

Unquestionably, a mother who intends to retain custody of and raise the child[8] has, and always had, an important interest in a paternity proceeding. We recognized that interest in *Fiege v. Boehm, supra,* 210 Md. 352, 123 A.2d 316, and, until the 1997 amendment to § 10–115 noted above, it was not entirely clear what the relationship was between her and the State's Attorney. The immunity question cannot depend, however, on whether, for other purposes, an attorney-client relationship existed between them, or, indeed, that the action was a civil, rather than criminal, one. Although the law underwent significant change in 1963, the role of the State's Attorney has remained essentially what it was from the beginning—to represent the public interest in assuring that children born out of wedlock are given proper support by their parents and do not become public charges. We need not decide here whether, in performing an investigatory role under § 5–1019 of the Family Law Article, the successor to

---

7. Section 10–109 required the Administration to approve for child support services any individual who could not afford private counsel and who filed an application and paid a fee determined by the Administration. A 1998 amendment to that section deleted the requirement that the person be unable to afford private counsel. *See also* COMAR 07.07.01.08.

8. As we have observed, a paternity action may also serve as the mechanism for determining custody of the child. If the father or someone else is awarded custody, the mother may well end up being the payor, rather than the recipient, of child support.

Article 12, §§ 5, 6, and 7, the State's Attorney possesses only the qualified immunity applicable to investigatory functions. It is clear, however, that once the decision is made to proceed against a particular individual, the function becomes a quasi-judicial one. Whether the proceeding was criminal, civil, or, as we previously observed, some mix of the two, the State's Attorney has always appeared, and continues to appear, in a public, not a private capacity, in accordance with a legislative mandate. Functionally, appellees were performing the same kind of service they perform when prosecuting criminal actions: representing the public interest through a judicial proceeding. The public policy considerations that justify the extension of absolute prosecutorial immunity with respect to criminal actions apply equally to these actions as well.

This conclusion, mandated by reference to Maryland law, is in conformance with the law generally throughout the country. In *Hanson v. Flores*, 486 N.W.2d 294 (Iowa 1992), a case almost directly on point, a prosecutor filed a paternity action against a putative father to collect sums paid by the State with respect to the birth of a child out of wedlock. The "father" acknowledged paternity and agreed to reimburse the State. In a second paternity action, to collect ongoing support, the defendant denied paternity. The prosecutor entered into a stipulation that, (1) if a blood test showed a greater than 90% probability of paternity, the defendant would admit paternity and agree to pay support, (2) if the test excluded the defendant by 90% or more, the action would be dismissed, and (3) if the test result fell within neither category, the case would proceed and the result would be admitted for whatever value it might have. When the test absolutely excluded the defendant—showed a 0% chance of paternity—the prosecutor dismissed the action, in accordance with the stipulation. After a third action filed by the mother privately was dismissed on *res judicata* grounds, the mother sued the prosecutor for negligence in permitting the putative father to contest paternity in the second suit after having acknowledged it in the first. She argued, as Joyce does, that prosecutorial immunity should not

apply because the paternity action was a civil one in which the prosecutor represented her.

Affirming the dismissal of her complaint, the Iowa Supreme Court, at 296, concluded:

"We believe that the rationale underlying prosecutorial immunity supports its adoption in this case. The state obviously has a strong interest in collecting child support, just as it has in the zealous enforcement of its criminal laws. A county attorney must be permitted to pursue support claims with the confidence that he or she will not be the subject of a suit by a disgruntled litigant, on either side, in the support case."

Similar results have been reached in other cases. In *Origel v. Washtenaw County*, 549 F.Supp. 792 (E.D.Mich.1982), the mother of a child born out of wedlock sued the prosecutor who had filed a paternity action that was later dismissed for lack of prosecution. The action was brought under 42 U.S.C. § 1983. Based on *Imbler v. Pachtman, supra*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128, the court held that the defendant was protected by absolute prosecutorial immunity and dismissed the complaint. *See also Johnson v. Granholm*, 662 F.2d 449 (6th Cir.1981), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1332 (1982); *Duerscherl v. Foley*, 681 F.Supp. 1364 (D.Minn.1987), *aff'd*, 845 F.2d 1027 (8th Cir.1988). The same immunity has also been applied in suits against prosecutors by putative fathers and their families based on allegations that the prosecutors' conduct was too aggressive or otherwise inappropriate. *See Kaplan v. LaBarbera*, 58 Cal.App.4th 175, 67 Cal.Rptr.2d 903 (Cal.App.1997); *Clifford v. Marion County Pros. Atty.*, 654 N.E.2d 805 (Ind.App.1995).

For the reasons noted, we hold that the circuit court correctly applied absolute immunity and dismissed Joyce's complaint.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.